[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-11126

_____

D.C. Docket No. 1:09-cr-00406-TCB-JFK-2

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

BENJAMIN STANLEY,
RUFUS PAUL HARRIS,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

(January 6, 2014)

Before TJOFLAT and MARCUS, Circuit Judges, and VINSON,[*] District Judge.

MARCUS, Circuit Judge:

_____

[*] Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida, sitting by designation.

Co-defendants Rufus Paul Harris and Benjamin Stanley appeal their securities fraud convictions and sentences stemming from their role in a "pump and dump" scheme, in which misrepresentations artificially boost a company's stock price and allow insiders to sell inflated shares. Moments before Harris and his co-defendants were to present opening statements in their securities fraud trial, he moved to represent himself. After this wish was granted, and after the Government had rested its case, Harris fled from justice. Now Harris and co-defendant Stanley contend that the district court's responses to Harris's conduct violated their constitutional rights. Specifically, Harris claims that his Sixth Amendment rights were violated both because he did not validly waive his right to counsel and because his standby counsel was not permitted to represent him after he ran. However, the record as a whole establishes that Harris waived his right to counsel knowingly, intelligently, and voluntarily. Moreover, in the face of this valid waiver, the district court did not err by refusing to allow counsel to represent an absconded Harris. Stanley argues, in turn, that the district court should have severed his case and declared a mistrial once Harris fled. But the district court, which issued a curative instruction to mitigate any perceived prejudice, did not abuse its discretion in refusing to grant severance and mistrial.

Raising additional challenges to sentencing, Harris claims that the district court impermissibly considered his lack of remorse in violation of his Fifth

2

Amendment rights.  But because the court at no point pressured Harris into foregoing his right to silence, it did not err by considering remorseless statements freely volunteered by Harris at the sentencing hearing.  Finally, Stanley says that he should have received a minor role reduction and that his sixteen year sentence was unreasonable.  However, the district court did not clearly err in finding that Stanley played more than a minor role in this massive fraud, and it did not abuse its considerable discretion because Stanley's sentence was substantively reasonable.  Because we are persuaded by none of their claims, we affirm the convictions and sentences of both defendants.

## I.

### A.

On September 15, 2009, a federal grand jury in the Northern District of Georgia indicted Harris, Stanley, and Darryl Horton for securities fraud and conspiracy.  A November 9, 2009, superseding indictment charged the three co-defendants with seven counts: conspiracy to commit securities fraud, in violation of 18 U.S.C. § 1349; a substantive securities fraud charge, in violation of 18 U.S.C. § 1348; and five counts of wire fraud, in violation of 18 U.S.C. § 1343.  Harris was charged alone in an eighth count with false certification of a financial statement, in violation of 18 U.S.C. § 1350(c)(1).

At trial, the Government adduced these essential facts: Harris founded and served as Chief Executive Officer of Conversion Solutions Holdings Corporation ("CSHC"), a Delaware company operating out of Kennesaw, Georgia.  Stanley, CSHC's cofounder, served as Chief Operating Officer.  The third co-defendant, Chief Financial Officer Horton, is not part of this appeal.  Viewed most charitably, CSHC's business model sought to fund small businesses that were frozen out of the mainstream credit market.  CSHC traded publicly over the counter as a penny stock, and the company was required to file periodic reports with the SEC.

Despite its officers' rosy representations, for a "holdings corporation," CSHC held very little.  Harris and Stanley falsely represented that CSHC owned and maintained hundreds of millions of dollars in assets, including a "UCC Security Note" worth $310 million that CSHC had purchased for $40 million. Harris issued a series of press releases claiming that CSHC owned or controlled entire issuances of foreign sovereign bonds of Venezuela and Finland worth billions of dollars and paying tens of millions in annual interest.  Several of these press releases named Stanley alongside Harris as a CSHC contact person.  CSHC's 2006 10-K, filed with the SEC by Harris, claimed assets of $800 million, counting the foreign sovereign bonds and the "UCC Security Note," along with income of nearly $20 million in interest from the bonds -- CSHC's only income.  Stanley and Harris signed a management representation letter in which they attested to the

4

accuracy of financial information provided to an outside auditor who prepared the financial statements attached to SEC filings.  Both Stanley and Harris solicited individual investors and gave statements in radio interviews that confirmed ownership of the sovereign bonds and promoted the value of company stock. Investors testified that they relied on these misrepresentations when choosing to invest.  All the while, CSHC had few (if any) real assets.  The worthless "UCC Security Note" was not legitimate, and CSHC had not purchased it for $40 million. CSHC did not own or control the foreign bonds.  The company never earned any revenue and was financed solely by $1.8 million in cash from investors, from which Harris and Stanley each drew more than $300,000 in salary.

The co-defendants held significant equity in CSHC.  Through much of September 2006, CSHC stock traded around one dollar per share.  At the end of that month, as the misrepresentations in press releases and SEC filings took hold, the stock price tripled in forty-eight hours to over three dollars per share, and it remained artificially elevated for several weeks.  With the "pump" in progress, the "dump" began.  The co-defendants each transferred substantial amounts of stock to close family members who sold hundreds of thousands of shares at inflated prices. By the time the SEC filed suit and halted trading in CSHC on October 24, 2006, nearly 6,000 investors had lost an estimated $42 million.

B.

5

On November 5, 2009, shortly after the co-defendants were indicted, the district court appointed attorney Howard Jay Manchel as Harris's counsel. Manchel represented Harris in all pretrial proceedings. The record shows no previous request from Harris for pro se representation before trial began on May 12, 2011. But after a jury was empaneled and the Government presented its opening statement, Manchel informed the court that Harris had expressed a desire to represent himself. The following exchange took place:

Harris:    I can't exactly think of the motion that needs to be filed, mandate, mandel [sic], to where I remove my -- I put a motion before the Court to remove my attorney and represent myself. Or can I represent myself and have him to advise me on technical paperwork and motions at this point?

The Court:    So, you want to represent yourself?

Harris:    Again, can I represent myself and have him to advise me in technical matters and objections and stuff of that type?

The Court:    Mr. Manchel, how do you feel about serving as stand-by counsel?

Manchel:    Judge, I don't -- I'll do what my client wants.

The Court:    All right. Your motion's granted. You represent yourself and Mr. Manchel will serve as stand-by counsel. As long as you understand that this is a very important decision that you're making and one that most lawyers would advise against and most people who have experience in this field would advise against, and that -- I assume that you do not have any significant legal experience or expertise. Am I right about that?

6

Harris:      That is true, Your Honor.

The Court:   Okay.  The Court would advise you, sir, that you should proceed very cautiously before you -- before you decide to make this decision, but if you want to do this, you may -- you may do so.  But you just have to understand that you have to live with the consequences of your decision, and that you have the right to have counsel at all times during this proceeding and you would be waiving that right, and that you have to tell me that you're freely and voluntarily waiving it, understanding that you know you have that constitutional right.  Is that the case?

Harris:      Is having him as stand-by counsel waiving my right?

The Court:   Yes, you're waiving your right to -- you're representing yourself.

Harris:      I understand that.  But he's going to be there to technically advise; right?

The Court:   He'll be there to consult with you.

Harris:      Right.  Okay.  Thank you.  Yes, Your Honor.  I understand.

The Court:   If you have any technical questions that you feel you need his help in, he will assist you.  But you will --

Harris:      Yes, sir.

The Court:   It's very different from him representing you in an ordinary capacity.  You will be doing the lion's share of the work in all likelihood, but you will be able to confer with him as you deem necessary.

Harris:      Yes, sir.  I understand --

The Court:   All right.  I assume that you --

7

Harris:        -- that I'm waiving my right to counsel.

The Court:  Sir?

Harris:        I said yes, sir, I understand that I'm waiving my right to counsel.

The Court:  All right, sir.  So, will you be making an opening statement on behalf of yourself?

Harris:        Yes, sir.

The Court:  All right.  Let's bring the jury back . . . .

The Court also said: "And I just want to state on the record I think you're making a huge mistake."  Harris responded: "Thank you.  I would have been disappointed if you didn't say that . . . ."  Harris and counsel for the other defendants gave their opening statements.

After opening statements had concluded, and less than two hours after the first exchange with Harris concerning waiver of his right to counsel, the trial judge engaged Harris again, this time in a deeper colloquy about self-representation. During the second set of questions, the court inquired if Harris was "in good physical health" ("Yes"); if he was "using any medication that might impair [his] judgment right now" ("No"); if he was "suffering from any physical or mental affliction or disease that might impair [his] judgment" ("No"); if he understood that he would "be required to comply with the rules of procedure and evidence during the trial even though [he was] not a lawyer" ("Yes"); if he was "making

8

[the] decision because anyone's compelled [him] to or coerced [him] to" ("No"); if he was "aware, from talking to Mr. Manchel in preparation for this case, of whatever defenses there might be that you have" ("Yes"); and if he understood that the charges carried a maximum possible prison sentence of 160 years" and "hundreds of thousands of dollars, if not over a million dollars" in possible fines ("Yes").  When Harris asked, the court arranged for Manchel to provide him with copies of procedural and evidentiary rules.  Harris's answers during this second colloquy were generally straightforward, though he misunderstood the court's first question concerning coercion, initially saying that he had been coerced, threatened, or forced "[f]or the past four and a half years," by the fact "[t]hat we have a case, period," because "my family and I went through living Cain and my name's crap."

Trial continued, with Harris representing himself during the Government's case-in-chief and a portion of the defendants' case.  Harris actively advocated in his own defense -- he invoked the rule of sequestration; made numerous evidentiary objections; examined witnesses; distinguished Government case law while arguing in response to a motion in limine; and argued a Rule 29 motion.  As standby counsel, Manchel provided Harris with active support by, among other things, assisting with the preparation of witness subpoenas, addressing the court on Harris's behalf in responding to objections, and drafting proposed jury instructions.

9

On May 24, 2011, after eight days of testimony and the completion of the Government's case-in-chief, and with only the potential testimony of three defense witnesses and closing arguments remaining, Harris abandoned ship, absconding from the trial. The court dismissed the jury for the day and requested briefing as to the proper response to Harris's absence. Manchel asked that he be allowed to represent Harris because he had played an active role as standby counsel. The court refused to appoint Manchel as counsel, finding that Harris had been "fully advised by the Court of the risks and dangers inherent in self-representation," that Harris "indicated quite clearly and unambiguously that he wants to represent himself," and that Harris nonetheless absconded.

Co-defendants Stanley and Horton moved for a mistrial, claiming that the three defendants jointly had raised a good faith defense that was irreparably undermined by Harris's flight. The district court refused to grant a mistrial, citing the expense and delay it would cause, the burden it would impose on the Government, witnesses, and victims, and the fact that the three defendants' interests "are not totally aligned." The court further concluded that the Government could present testimony regarding Harris's flight as evidence of his consciousness of guilt. The trial court agreed, however, to provide the jury with a cautionary instruction that this evidence could only be considered as to Harris, and that no adverse inference could be imputed against Stanley or Horton. Stanley and

10

Horton agreed to the proposed instruction.  When trial resumed the next day, May 25, 2011, the court instructed the jury that "no negative inference whatsoever should be drawn as to Defendants Horton and Stanley from Mr. Harris' absence."

Before Harris absconded, he had called and examined three witnesses, though he had subpoenaed three more.  On May 25, after counsel for Horton called two of the three remaining witnesses, the defense rested.  The Government presented two rebuttal witnesses who testified that Harris had checked out of his hotel and could not be located.  In their closing arguments, Stanley and Horton used Harris's flight to distinguish their roles -- and culpability -- as far more limited.  Stanley's counsel argued that Harris and Stanley were not "joined at the hip"; that Harris controlled CSHC; and that, unlike Harris, "Mr. Stanley came here. He did not flee.  He did not run.  He says you know what, I'm innocent."  Horton's counsel said Horton, who "didn't attempt to flee," was unlike Harris, "the man with the plan, the man who ran."

On May 26, 2011, the jury found Harris guilty of all eight counts.  It found Stanley guilty of Counts 1, 2, 4, 5, and 7, but not guilty on Counts 3 and 6.  The jury acquitted Horton on Counts 3, 4, and 5, and hung on the remaining counts. Horton entered a guilty plea on May 27 to a single-count information charging him with conspiracy to commit mail-fraud, in violation of 18 U.S.C. § 1341.  The district court dismissed the remaining counts against Horton.

After a nationwide manhunt, federal marshals apprehended Harris 2,000 miles away, in Provo, Utah, on May 28, 2011. With Harris back, the district court held a sentencing hearing for all of the defendants on February 23, 2012. Manchel resumed his representation of Harris at sentencing. In addressing the court, Harris stated that he "was completely transparent," that there was no "attempt to hide anything, because we did nothing wrong," and, turning to his children, "you know I didn't do this. So don't you believe one word that these people are saying . . . ." Manchel noted that his client Harris was psychiatrically examined after trial and diagnosed with a personality disorder with narcissistic tendencies. The district court found that Harris was "clearly mentally competent."

Meanwhile, Stanley argued that his Sentencing Guidelines range should reflect a four-level "minimal role" reduction. The district court disagreed, finding that, although Stanley was not as culpable as Harris, he was "obviously not a minimal participant" for purposes of a 3B1.2 reduction. Still, the court noted that Stanley's lower culpability "will be very relevant" and "will be accounted for" at sentencing.

The district court observed that the Government had "conservatively concluded" that over 6,000 accounts lost money, with total losses exceeding $42

million.[1]  See U.S. Sentencing Guidelines Manual §§ 2B1.1(b)(1)(K);

2B1.1(b)(2)(C) (2011).  For the purposes of Guidelines calculations, the parties

stipulated to a loss amount between $7 million and $20 million.  The court found

that CSHC "had no operations whatsoever" and that Harris and Stanley "blatantly

falsely lied" about CSHC.  As the district court put it, this fact distinguished a

crime of impulse from the fraud involved in this case, which evinced "this much

aforethought, this much scheming, this much deliberation involved, the planning

. . . at the expense of these innocent investors."  The court also credited trial

evidence showing that Harris and Stanley had participated in a similar "pump and

dump" scheme at Broadband Wireless.

The district court calculated that Harris had an advisory Guidelines offense

level of thirty-nine and a criminal history category of III, yielding a Guidelines

range of 324 to 405 months.  Harris argued for a below-Guidelines sentence,

asserting that his criminal history category was exaggerated since it was drawn

only from two DUI convictions and from the fact that he had been on probation

during the securities offense.  Ultimately, the district court sentenced Harris to 276

months of imprisonment, five years of supervised release, restitution of

---

[1] The Presentence Report stated 5,894 victim accounts were affected, far in excess of the 250 victims relevant for the Sentencing Guidelines.  See U.S. Sentencing Guidelines Manual § 2B1.1(b)(2)(C) (2011).

$44,025,620 to be paid jointly and severally with his co-defendants, and a special assessment of $800.

As for co-defendant Stanley, the district court found that his base offense level began at seven. Id. § 2B1.1(a)(1). Twenty levels were added because of the stipulated loss between $7 million and $20 million. Id. § 2B1.1(b)(1)(K). Six levels were added because the offense involved 250 or more victims. Id. § 2B1.1(b)(2)(C). Four more levels were added because the offense involved a violation of securities law when the defendant was an officer of a publicly traded company. Id. § 2B1.1(b)(18)(A). As a result, Stanley's offense level was thirty-seven. He had no criminal history points and a criminal history category of I, yielding a range between 210 and 262 months of incarceration.

Stanley presented four character witnesses and personally addressed the court at sentencing, insisting that he had been unaware of the fraudulent activity and had not intended to defraud anyone. The district court sentenced Stanley to imprisonment for 192 months, five years of supervised release, joint and several restitution, and a special assessment of $500.

Just before pronouncing these sentences, the trial court observed that it had carefully considered the § 3553(a) factors, and added that it was "particularly disturbed by the amount of the loss and by the recalcitrance or at least the transigence of the defendants Harris and Stanley. They are adamant in their

14

insistence that they have done nothing wrong." After hearing his client's sentence,

counsel for Harris stated, "I guess I really object to the Court's great emphasis in

this sentence on my client's failure to what I see repent before this Court." The

Court responded:

> I am just making the point that he is not repentant. Listen, I want the
> record to reflect that is just a factor, and I use the indefinite article
> specifically it is "a" factor. Not "the" factor, it is one of many factors.
> And I don't want anything that I have said to be misconstrued as over-
> emphasizing that point because I am really not. The biggest factor,
> frankly, to the Court, is that the crime was willfully committed, the
> Defendants were all convicted by a jury, and the amount of the loss is
> enormous. Those are the most important factors the Court, and they
> all drive 3553(a) for me.

The Court continued: "I am not trying to hide anything. I have no reservation

whatsoever about pointing out that I am disturbed by the fact that this man

continues to insist that he did nothing wrong. I have a problem with that, but that

is not why I am sentencing him to 23 years in prison, okay?" Stanley's counsel

also objected to the consideration of lack of remorse.

Harris and Stanley filed timely notices of appeal. We have jurisdiction

pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## II.

## A.

First, Harris claims that his waiver of the right to counsel at trial was invalid

from the outset and that the district court erred in allowing him to represent

15

himself.  We review <u>de novo</u> whether a defendant validly waived the right to counsel as a mixed question of law and fact.  <u>United States v. Garey</u>, 540 F.3d 1253, 1268 (11th Cir. 2008) (en banc).  On direct appeal, the Government bears the burden of proving a valid waiver.  <u>United States v. Cash</u>, 47 F.3d 1083, 1088 (11th Cir. 1995).  If the Government cannot meet this burden, the defendant need not show prejudice to obtain a reversal.  <u>See</u> <u>id.</u> at 1090 n.5; <u>United States v. Fant</u>, 890 F.2d 408, 410 (11th Cir. 1989).

The Government argues, though, that Harris's failure to challenge the validity of his waiver in the district court makes plain error review appropriate.  No published case in this Circuit explicitly addresses the question, though the mine run of cases apply <u>de novo</u> review without discussing whether a defendant formally objected at trial.  <u>See, e.g.</u>, <u>United States v. Evans</u>, 478 F.3d 1332, 1340 (11th Cir. 2007); <u>Cash</u>, 47 F.3d at 1088.  However, one unpublished opinion cited by the Government applied plain error review in this context.  <u>See United States v. Talley</u>, 315 F. App'x 134, 136 (11th Cir. 2008) (per curiam) (unpublished).[2]

---

[2] Approaches to this question differ across, and even within, other circuits.  <u>See, e.g.</u>, <u>United States v. Bernard</u>, 708 F.3d 583, 588 n.7 (4th Cir. 2013) ("[Because] defense counsel 'bears substantial responsibility' for allowing the alleged error to pass without objection . . . [we] conclude that, at a minimum, his failure to preserve the claim of invalid waiver warrants plain error review."); <u>id.</u> at 596 (Diaz, J., dissenting) ("[W]hen a defendant requests to proceed pro se at a competency hearing, he has sufficiently put his competency at issue to preserve a claim of invalid waiver of counsel." (footnote omitted)); <u>United States v. McBride</u>, 362 F.3d 360, 365 (6th Cir. 2004) ("In this circuit . . . two trends have developed.  We have on occasion applied 'plain error' review to examine the validity of a defendant's waiver of counsel.  Other panels have approached the waiver-of-counsel issue by omitting discussion of the standard of review

The appropriate standard of review thus presents an unsettled question. On the one hand, a defendant's motion to represent himself could be seen as effectively placing the validity of the waiver before the court. Moreover, a defendant would undermine his chance of success in a Faretta hearing by second-guessing his own motion. On the other, plain error review may be appropriate, especially here because Manchel represented Harris at the sentencing hearing, where he easily could have challenged Harris's previous waiver before the district court. Regardless, we need not and do not decide this question because Harris's argument fails when measured under either standard. For that reason, we examine his claim de novo.

B.

In Faretta v. California, 422 U.S. 806, 834 (1975), the Supreme Court recognized that a defendant may exercise a right to self-representation by making a knowing and voluntary waiver of the right to counsel. "The ideal method of assuring a voluntary waiver is for the trial judge to conduct a pre-trial hearing at

---

and proceeding to engage in a thorough review of the colloquy between the district court judge and the defendant." (citations omitted)); United States v. Erskine, 355 F.3d 1161, 1166-67 (9th Cir. 2004) ("Our requirements for reviewing the validity of a Faretta waiver are predicated on the fact that we do not expect pro se defendants to know the perils of self-representation, and consequently, we cannot expect defendants to recognize that they have not been correctly and fully advised, let alone to point out the court's errors. Accordingly, plain error review would be inappropriate, and we instead perform the simple de novo review in which we have customarily engaged.").

which the defendant would be informed of the charges, basic trial procedures, and the hazards of self-representation." Strozier v. Newsome, 926 F.2d 1100, 1104 (11th Cir. 1991). However, "[w]hile a pretrial hearing is preferred, it is not required." Cash, 47 F.3d at 1088. "The hearing . . . is a means to the end, namely ensuring a voluntary and intelligent waiver." Strozier v. Newsome, 871 F.2d 995, 998 (11th Cir. 1989). The failure to hold a Faretta hearing "is not error as a matter of law. If the trial record shows that a defendant knowingly and voluntarily elected to represent himself, the Faretta standard will be satisfied." Nelson v. Alabama, 292 F.3d 1291, 1295 (11th Cir. 2002). "As long as the record establishes that the defendant understood the risks of self-representation and freely chose to face them, the waiver may be valid." Strozier, 926 F.2d at 1105. "The ultimate test is not the trial court's express advice, but rather the defendant's understanding." Fitzpatrick v. Wainwright, 800 F.2d 1057, 1065 (11th Cir. 1986).

Fitzpatrick elaborated eight factors for consideration in determining whether a defendant executed a knowing and voluntary waiver of the right to counsel: (1) the defendant's age, educational background, and physical and mental health; (2) the extent of the defendant's contact with lawyers prior to trial; (3) the defendant's knowledge of the nature of the charges, possible defenses, and penalties; (4) the defendant's understanding of rules of procedure, evidence and courtroom decorum; (5) the defendant's experience in criminal trials; (6) whether

18

standby counsel was appointed, and the extent to which that counsel aided defendant; (7) mistreatment or coercion of the defendant; and (8) whether the defendant was trying to manipulate the events of the trial.  800 F.2d at 1065-67.

In this case, the district court did not initially conduct an adequate Faretta inquiry before it allowed Harris to represent himself during his opening statement. When Harris first announced his intention to proceed pro se, the district court noted that it was "a very important decision," requested that Harris's former attorney serve as standby counsel, confirmed that Harris had no "significant legal experience or expertise," and asked Harris whether he was "freely and voluntarily waiving" his "right to have counsel at all times during this proceeding."  The inquiry fell well short of covering all, or even most, of the Fitzpatrick factors.  It did not inquire into the defendant's health; did not probe Harris's understanding of the nature of the charges, defenses, and penalties; did not assess his grasp of court rules or procedures; and did not look for mistreatment or coercion motivating Harris's decision.

A defendant's waiver must be knowing and voluntary at the time pro se representation is first permitted: the fact that a defendant later became aware of the consequences of his decision may not cure a waiver that was initially unknowing. Evans, 478 F.3d at 1340 ("Before the court grants the defendant's request, the court must make the defendant 'aware of the dangers and disadvantages of self-

19

representation, so that the record will establish that he knows what he is doing and his decision is made with his eyes open.'" (quoting Faretta, 422 U.S. at 835)). Nevertheless, we may look to subsequent events during a trial as evidence of what would have been true when a defendant first waived his rights. See Fitzpatrick, 800 F.2d at 1065 ("If the trial record demonstrates that [the defendant's] decision to represent himself was made with an understanding of the risks of self-representation, the knowing, intelligent, and voluntary waiver standard of the Sixth Amendment will be satisfied."). Thus, we consider how ably a pro se defendant performed in presenting his case as evidence of his understanding of rules of procedure, evidence, and courtroom decorum. And the extent of standby counsel's aid to a defendant can only be measured after the fact.

Notably, however, after Harris gave his opening statement, on round two the district court expansively addressed many of the Fitzpatrick factors. Moreover, the two colloquies occurred on the same day, the first of trial, less than two hours apart. We have no reason to believe that the defendant gave different answers during the latter exchange than he would have, if asked, in the initial conversation. Harris's consistent, repeated responses to a far more searching inquiry left no doubt that he intended to proceed pro se, despite well knowing what he was getting himself into. While we may not simply presume that Harris initially knew all of the information delivered during the second colloquy, we can look to the whole

20

record for evidence of whether Harris's waiver was knowing and voluntary and therefore valid when initially made.  Measured against the Fitzpatrick factors, the record -- including Harris's behavior during the second colloquy -- fairly establishes that he originally made a knowing, intelligent waiver "with eyes open." Faretta, 422 U.S. at 835 (quoting Adams v. United States ex rel. McCann, 317 U.S. 269, 279 (1942)).

## 1.  Age, education, and health

At trial, Harris was a forty-three-year-old high school graduate.  The district court found the former CSHC CEO to be "a very bright man" who had been responsible for his company's SEC filings.  See Fitzpatrick, 800 F.2d at 1066 ("Especially relevant to [Defendant's] understanding of the risks of self-representation with respect to the securities charges is the fact that he is an experienced stockbroker."); see also United States v. Kimball, 291 F.3d 726, 731 (11th Cir. 2002) (finding waiver from a defendant with an eleventh-grade education to be valid when he was a "sophisticated businessman").  During the second inquiry, Harris confirmed that he was in good physical health, that he was not using any medication that might impair his judgment, and that he did not suffer from any relevant physical or mental condition.

Harris now points out, however, that a presentencing evaluation diagnosed him with a personality disorder with narcissistic issues.  Therefore, his argument

goes, he was disposed to overestimate his abilities and could not accurately assess the waiver decision, even though the district court found that Harris was "clearly" legally competent.

Two Eleventh Circuit cases have reached different conclusions concerning defendants with narcissistic personality disorders who attempted to represent themselves. In United States v. McKenzie, 160 F. App'x 821, 827 (11th Cir. 2005) (unpublished), the Court found that the defendant was competent to waive counsel despite a post-trial diagnosis when he "was well aware of the risks posed by self-representation." In Cash, by contrast, a panel of this Court found after a pre-trial diagnosis as part of a competency evaluation that, "considering the inadequacy of the district court's colloquy with Appellant," the Appellant's mental problems tipped the balance in favor of finding that the waiver of counsel was neither knowing, voluntary, or intelligent. 47 F.3d at 1089. Here, unlike in Cash, the defendant had not previously been declared incompetent before trial, and the Cash diagnosis called the defendant's legal judgment into serious doubt. McKenzie, which featured a post-trial, pre-sentence diagnosis like that received by Harris, more closely resembles this case. And, of course, each case of waiver will turn peculiarly on its own set of facts.

Indeed concluding otherwise, and restricting Harris's right to waive counsel simply because of a post-trial diagnosis of antisocial personality, would undermine

the theory of informed free choice at the heart of Faretta.  The Supreme Court has instructed us that the Sixth Amendment requires courts to respect the wishes of a defendant who is "literate, competent, and understanding," and who is "voluntarily exercising his informed free will."  Faretta, 422 U.S. at 835-36.  "It is the defendant . . . who must be free personally to decide whether in his particular case counsel is to his advantage."  Id. at 834.  Despite the post-trial diagnosis, the first Fitzpatrick factor weighs in favor of finding a voluntary waiver by Harris -- a healthy, intelligent, middle-aged businessman well-versed in the securities field.

2.  Contact with lawyers prior to trial

As the district court had reason to know, attorney Manchel represented Harris up until the pro se motion on the first day of trial, from November 5, 2009, until May 12, 2011.  This representation likely exposed Harris to the complexity of his case and the legal process.  See Fitzpatrick, 800 F.2d at 1066.  In Fitzpatrick, this factor favored a valid waiver when a defendant "had significant contact" with an attorney before trial, even though he never actually retained counsel.  Id. ("Through this contact, [Defendant] must have recognized that his case was more complex than he originally thought.").  Because of Harris's lengthy pre-trial relationship with his court-appointed attorney, this factor weighs in favor of a valid waiver.

3.  Knowledge of the nature of the charges, possible defenses, and penalties

23

When he moved to represent himself, Harris was abundantly aware of the seriousness and complexity of the charges, which were part of a prosecution that had engulfed nearly four years of his life.  Harris's business background, including his prior involvement in a similar scheme, exposed him to the complexity of a securities fraud case.  In fact, Harris had just heard the Government's opening statement, which laid out the nature of the charges against him.  And during the court's second colloquy concerning Harris's decision to represent himself, Harris indicated that the charges had severely impacted his life "[f]or the past four and a half years," because "my family and I went through living Cain and my name's crap."  During that exchange, the court also expressly informed Harris that he faced a maximum of 160 years in prison and could be forced to pay millions of dollars.  Harris showed no surprise at hearing the severity of the charges, and in no way indicated that the possible penalties undermined his decision to continue pro se.  His ultimate decision to abscond during the twilight of the trial also strongly suggests that Harris was well aware of the consequences he faced.  Because the record amply shows Harris was aware of the seriousness and complexity of the charges, this factor also indicates a valid waiver.

4.  Understanding of rules of procedure, evidence and courtroom decorum

Harris appears to have had a limited legal background, but the district court granted his request that attorney Manchel be made available as standby counsel for

24

technical and procedural questions. "[T]echnical legal knowledge . . . [is] not relevant to an assessment of [a defendant's] knowing exercise of the right to defend himself." Faretta, 422 U.S. at 835. Instead, the fourth factor favors a valid waiver when a defendant "understood that rules do exist to govern the procedure of a trial, the introduction of evidence and the behavior of advocates and . . . that he would be bound by those rules." Kimball, 291 F.3d at 731. By all accounts, Harris acquitted himself well as an advocate during trial -- like in Fitzpatrick, "he generally knew how to handle himself in court." 800 F.2d at 1067. Harris made evidentiary objections, examined witnesses, distinguished Government case law, invoked the rule of sequestration, and argued motions, including a motion in limine and a Rule 29 motion. All indications are that Harris, with Mandel's assistance, performed adequately at trial, which also suggests a valid waiver.

5. Experience in criminal trials

Harris had no criminal trial experience. While this weighs against recognizing a waiver as valid, it is far from dispositive, as a number of cases in this Circuit have held a waiver to be knowing and voluntary in the absence of past trial history. See Jones v. Walker, 540 F.3d 1277, 1295 (11th Cir. 2008); Fitzpatrick, 800 F.2d at 1067. "All factors need not point in the same direction." Cash, 47 F.3d at 1089.

6. Appointment of and assistance from standby counsel

25

After representing the defendant in this very case for an extended period of time, Manchel served as standby counsel and assisted with technical legal issues and procedural matters throughout the trial.  Indeed, Harris admits that Manchel "had taken an active role as standby counsel, including making objections for Mr. Harris, submitting charges on his behalf, procuring and interviewing witnesses, asking for bench warrants, and interceding with the court."  Appellant Harris's Br. 22-23.  Manchel's availability and performance as standby counsel weighs in favor of voluntariness.

7.  Mistreatment or coercion

Harris does not argue that he was subject to any coercion or mistreatment in waiving his right to counsel.

8.  Efforts to manipulate the events of the trial

Finally, and especially important in this case, Harris attempted to delay and manipulate the trial proceedings, making clear that he understood the palpable risks he faced.  See Fitzpatrick, 800 F.2d at 1067 ("[Defendant] manipulated the proceedings, the trial court and his numerous attorneys in an attempt to delay as long as possible having to answer the charges against him.").  Harris waited until the day of trial, and until after the jury had already heard the prosecutor's opening statement, to broach the topic of pro se representation.  But his most glaring effort at manipulation was his flight to Utah -- after the Government had rested its case-

26

in-chief and notably after his Rule 29 motion had been denied -- which delayed trial for a day and generated many of the grounds for this appeal.

Seven out of the eight Fitzpatrick factors -- all except Harris's criminal trial experience -- strongly suggest his waiver was knowing and intelligent.  Though the question is rendered somewhat more difficult by the delayed colloquy, after reviewing the entire record we are confident and hold that the district court did not violate Harris's right to counsel by allowing him to represent himself.[3]

## III.

Harris also argues that the district court erred by refusing to permit his standby counsel to represent him at trial after Harris absconded.  We review de novo Harris's claim that his Sixth Amendment rights were violated.  See United States v. Ignasiak, 667 F.3d 1217, 1227 (11th Cir. 2012); United States v. Yates, 438 F.3d 1307, 1311 (11th Cir. 2006).  In the face of Harris's knowing and intelligent Sixth Amendment waiver, the district court did not violate Harris's right to counsel by refusing to allow standby counsel to represent the runaway Harris during the final days of the trial.

Defendants who are not present at trial -- even those who flee from justice -- retain the right to counsel.  Golden v. Newsome, 755 F.2d 1478, 1482 (11th Cir.

---

[3] Out of an abundance of caution, we granted Harris's December 23, 2013, motion to supplement the record.  After thorough review, we find that none of the supplemental materials in any way alter our determination that Harris's waiver was knowing, voluntary, and intelligent.

1985) ("[A] defendant's escape . . . tells us very little about his intent to forego the right to be represented by counsel and to have effective assistance of counsel."). But defendants also have the right to waive counsel, and to be free from counsel imposed on them against their will. "Unless the accused has acquiesced" in representation by counsel, "the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not his defense." Faretta, 422 U.S. at 821. As the Supreme Court has explained, "the core of the Faretta right" is that "the pro se defendant is entitled to preserve actual control over the case he chooses to present to the jury." McKaskle v. Wiggins, 465 U.S. 168, 178 (1984).

We have not previously considered whether counsel must be appointed in a defendant's absence when the defendant has waived both the right to counsel and then the right to be present at trial. In Clark v. Perez, 510 F.3d 382 (2d Cir. 2008), the Second Circuit dealt with a case involving a defendant who waived her right to counsel and thereafter voluntarily absented herself as an act of political protest. The Second Circuit found that, "[i]f she faced trial without advantages guaranteed by the Sixth Amendment, that was not by the trial judge's imposition, but by her own informed choice, which the trial judge was bound to respect." Id. at 397.

Quite simply, Harris cannot show on this record that he rescinded his waiver of the right to counsel by absconding. With no other clues, his flight alone does

28

not indicate unambiguously a desire to revoke his valid Sixth Amendment waiver and reinstate Manchel as counsel of record.  Harris instead argues that the district court should have terminated his self-representation because he deliberately engaged in serious and obstructionist misconduct.  When pro se criminal defendants have been removed from a courtroom because of disruptive behavior, standby counselors have been permitted to step in.  Illinois v. Allen, 397 U.S. 337 (1970); see also United States v. Cork, No. 1:07-CR-183-WSD, 2008 WL 622822, at *3 (N.D. Ga. Mar. 4, 2008).  As a result, Harris insists that the district court could have allowed Manchel to serve in Harris's absence.  See Lefevre v. Cain, 586 F.3d 349, 356 (5th Cir. 2009) ("McCaskle . . . requires that standby counsel's participation be 'over the defendant's objection' in order to erode the defendant's Faretta rights.").  But in this case we are not confronted with the question, and thus need not decide, whether the Sixth Amendment would have allowed the district court to permit standby counsel to represent an absconded Harris.  Harris cannot show that the Sixth Amendment required the court to permit standby counsel to take over.  And we have little doubt that if the district court had permitted Manchel to pick up the representation of Harris after his flight, we would be confronted with the argument that the district court had improvidently and without any record support overruled Harris's earlier unambiguous desire for self-representation.

29

Moreover, Harris ignores that his own decision to flee made it impossible for the trial to continue "in like manner and with like effect as if he were present." Taylor v. United States, 414 U.S. 17, 19 (1973) (per curiam).  With or without standby counsel, the trial could not continue as before once pro se Harris absconded.  Though Harris originally requested that Manchel serve as standby counsel, he also made clear that he intended to set his own course.  Harris cannot now invoke a constitutional entitlement to the very counsel he knowingly and voluntarily rejected, solely because he bolted before the last day of trial.

## IV.

Co-defendant Stanley argues that the district court should have severed his case from Harris's and declared a mistrial after Harris absconded.  Stanley asserts that, when Harris ran, Harris's good faith came into serious question, as did Stanley's simply by association.  We are unpersuaded.

"A district court's denial of a motion for severance is reversible only for abuse of discretion, and we have explicitly noted that appellate courts are generally reluctant to second guess a district court's decision on severance."  United States v. Baker, 432 F.3d 1189, 1236 (11th Cir. 2005).  We also review the denial of a motion for new trial for abuse of discretion.  United States v. Campa, 459 F.3d 1121, 1151 (11th Cir. 2006) (en banc).  To show an abuse of discretion in the denial of severance, Stanley must show "specific and compelling prejudice"

resulting in "fundamental unfairness." Baker, 432 F.3d at 1236. Here there was neither, particularly in light of the court's curative instruction. The district court addressed possible prejudice by instructing the jury that "no negative inference whatsoever should be drawn as to Defendants Horton and Stanley from Mr. Harris' absence." See United States v. Carrazana, 921 F.2d 1557, 1568 (11th Cir. 1991); see also Murr v. United States, 200 F.3d 895, 904 (6th Cir. 2000); United States v. Rullan-Rivera, 60 F.3d 16, 20 (1st Cir. 1995).

Stanley's lone rejoinder is that he had hitched his star to Harris's through his good faith defense, and that Harris's flight -- and evident consciousness of guilt -- incurably tainted the jurors against the entire group. This story does not fit the facts surrounding the jury verdict, which discerned varying degrees of culpability among the co-defendants. Harris was convicted on all eight counts he faced; Stanley was convicted on five but acquitted on two; and Horton was acquitted on three with the jury hung on the remainder. While this result does not categorically prove the absence of a taint, it strongly suggests the jury thought critically and individually about the evidence of each defendant's culpability. Stanley offers no reason to believe the jury misunderstood or disregarded the district court's curative instruction. See United States v. Stone, 9 F.3d 934, 938 (11th Cir. 1993) ("Few tenets are more fundamental to our jury trial system than the presumption that juries obey the court's instructions."). "We have no reason to believe that the jury

31

in this case was incapable of obeying the curative instructions." Greer v. Miller, 483 U.S. 756, 766 n.8 (1987). The court acted well within its considerable discretion in proceeding with the joint trial when its instruction mitigated possible prejudice to Stanley's good faith defense.

This case is far from United States v. Tarango, 396 F.3d 666 (5th Cir. 2005), the only precedent cited by Stanley on this issue. In Tarango, Patel (a doctor) and Tarango (his office manager) were charged with health care fraud. Patel absconded after the jury was selected but before trial began. The district court allowed the joint trial to proceed with only Tarango present, even though a disproportionate number of witnesses testified only against the missing doctor, not the present office manager. After the jury found Tarango guilty, the judge ordered a new trial based on the failure to sever, and the Fifth Circuit affirmed. Id. at 668.

The procedural stance and the facts in Tarango stand in sharp contrast to the present case. Tarango found that the district court did not abuse its discretion in ordering a retrial; here, Stanley must make the more difficult showing that the district court did abuse its discretion. Id. at 675. Moreover, in Tarango, Patel missed the entire trial, and there "was little witness testimony that Tarango had engaged in wrongdoing." Id. at 670 n.7. Here, Harris actively participated in the first eight days of trial, and many witnesses established Stanley's heavy involvement in the fraud. The district court did not abuse its discretion.

32

Stanley also claims that he was prejudiced by the district court's refusal to allow Harris's standby counsel to present a closing argument. He cites no case law indicating that a defendant, whose counsel gave a closing argument, is or could be unfairly prejudiced when a co-defendant does not present a closing. If anything, Stanley's counsel took advantage of Harris's silence during closing by attempting to pin the entire scheme on the absent CEO.

V.

Finally, Harris argues that, by factoring in his lack of remorse during allocution, the district court held Harris's exercise of his Fifth Amendment privilege against self-incrimination against him. We review de novo whether the district court's consideration of a sentencing factor, such as Harris's lack of remorse, is impermissible. United States v. Clay, 483 F.3d 739, 743 (11th Cir. 2007). However, a sentence will only be unreasonable in this context if it was "substantially affected by the consideration of impermissible factors." Id. at 745.

Harris's argument confuses the nature of the Fifth Amendment privilege. During sentencing, a court "may not weigh the exercise of [Fifth Amendment] rights against the defendant." United States v. Rodriguez, 959 F.2d 193, 197 (11th Cir. 1992) (per curiam). But a court may take into account a defendant's freely offered statements indicating a lack of remorse. See id. ("The sentencing court is justified in considering the defendant's conduct prior to, during, and after the trial

33

to determine if the defendant has shown any remorse through his actions or statements."); cf. United States v. Barrington, 648 F.3d 1178, 1197 (11th Cir. 2011), cert. denied, 123 S. Ct. 1066 (2012); United States v. Hill, 643 F.3d 807, 882-83 (11th Cir. 2011), cert. denied, 132 S. Ct. 1988 (2012); United States v. Mateos, 623 F.3d 1350, 1367 (11th Cir. 2010).  Just as a jury weighs a defendant's testimony once he waives his Fifth Amendment privilege at trial, a judge may consider a defendant's freely offered allocution regarding remorse during sentencing.

Harris chose to allocute at his sentencing hearing without pressure from the court.  In the face of the substantial evidence presented at trial and the jury's verdict, Harris repeatedly denied any wrongdoing, insisting that "[t]his elaborate story is not what happened . . . .  I was completely transparent."  "I didn't steal no money from nobody."  He imagined that "[t]he jury convicted me because I got scared and I fled, I panicked.  That's the only reason."  Finally, he implored the court, "[y]our Honor, I am not this person y'all are making me out to be.  I don't do fraud.  Never have.  Never will.  I don't take money from people.  I am just not that person."  At no point did the court indicate that his silence would have been held against him.

34

With these facts, the two principal cases relied on by Stanley are inapposite. In Rodriguez and Thomas v. United States, 368 F.2d 941 (5th Cir. 1966),[4] district courts conditioned the grant of a lower sentence on the defendants' waiver of Fifth Amendment rights.  See Rodriguez, 959 F.2d at 197 (vacating sentences when the trial court "balanced the Appellants' statements of remorse against their refusal to admit their guilt in open court and their intent to appeal their sentences"); Thomas, 368 F.2d at 942 (vacating a sentence "because prior to imposing sentence the judge advised the defendant that the judge had no doubt whatsoever as to his guilt, and that if he then confessed his guilt the court would take that into account in the length of sentence to be imposed").  Unlike in Rodriguez and Thomas, Harris freely chose to profess his innocence at length during his allocution.  The district court in no way conditioned his sentence on his decision to exercise his constitutional rights.  Instead, it permissibly considered Harris's voluntary, repeated, emphatic, and unbelievable statements of innocence.

Harris cites United States v. Laca, in which the former Fifth Circuit stated:

[B]y opining that these defendants had not shown an inclination towards repentance, the court erred by predicating the length of these sentences on whether the defendants had confessed their crimes. This conditioning of sentences on defendants' confessions violated their right to avoid self-incrimination under the Fifth Amendment.

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

35

499 F.2d 922, 927 (5th Cir. 1974).  However, Laca does not mention whether the defendants invoked their Fifth Amendment privilege during sentencing and remained silent as to their culpability, or whether, like Harris, they freely and on their own initiative insisted they did nothing wrong.  Laca says little about a district court's consideration of a defendant's voluntary statements made at his own initiative during allocution.  As with his Sixth Amendment waiver arguments, the Constitution ensures Harris a fair trial.  It cannot always protect Harris from himself.

Because the district court's consideration of Harris's lack of remorse was permissible, we need not inquire as to whether the court's consideration of that factor "substantially affected" his sentence, rendering it unreasonable.  Clay, 483 F.3d at 745.

## VI.

Stanley makes two claims concerning his sentencing.  We are persuaded by neither.

## A.

First, he argues that the district court erred in failing to recognize him as a minor participant for purposes of the Sentencing Guidelines.  According to Stanley, although he was an active and significant figure with CSHC, and although he benefited handsomely from sales of stock, he had only a negligible role in the

perpetration of criminal conduct, and did not know that CSHC's assets were worthless or that the stock price was artificially inflated. In other words, he claims he was responsible for creating and executing the clean business model, not capitalizing the company with the dirty assets. But because evidence showed Stanley substantially participated in and profited from the criminal fraud, the district court did not clearly err in denying him a minor role reduction.

We review for clear error the district court's determination of Stanley's role in the offense as a finding of fact. United States v. Rodriguez De Varon, 175 F.3d 930, 937 (11th Cir. 1999) (en banc).

> As the Supreme Court has recognized, a trial court's choice between "two permissible views of the evidence" is the very essence of the clear error standard of review. So long as the basis of the trial court's decision is supported by the record and does not involve a misapplication of a rule of law, we believe that it will be rare for an appellate court to conclude that the sentencing court's determination is clearly erroneous.

Id. at 945.

At sentencing, Stanley bore the burden of proving that he played a minor role in the offense by a preponderance of the evidence. Id. at 939. The Sentencing Guidelines allow for downward adjustments in a defendant's offense level by 4 levels "[i]f the defendant was a minimal participant in any criminal activity," by 2 levels "[i]f the defendant was a minor participant in any criminal activity," and by 3 levels "[i]n cases falling between." U.S. Sentencing Guidelines Manual § 3B1.2.

The Commentary to the Guidelines explains that a "minimal participant" is a defendant who is "plainly among the least culpable of those involved in the conduct of a group." Id. § 3B1.2 cmt. 4. In making this assessment, "the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." Id. A "minor participant" is one "who is less culpable than most other participants, but whose role could not be described as minimal." Id. § 3B1.2 cmt. 5.

Under De Varon, in determining a defendant's mitigating role in the offense, the district court first "must measure the defendant's role against the relevant conduct for which [he] was held accountable at sentencing," and second, "may also measure the defendant's role against the other participants, to the extent that they are discernable, in that relevant conduct." 175 F.3d at 945. The first step of this analysis requires that the district court has held the defendant accountable only for activity or losses he participated in. "Only if the defendant can establish that [he] played a relatively minor role in the conduct for which [he] has already been held accountable -- not a minor role in any larger criminal conspiracy -- should the district court grant a downward adjustment for minor role in the offense." Id. at 944. In declining to make a minor role adjustment, the district court held Stanley

accountable for the millions of dollars in damages jointly caused by the defendants' securities fraud.

Stanley relies chiefly on his own testimony of his limited knowledge to establish his minor role. Yet, as the Government noted at the sentencing hearing, "much of [Stanley's] argument simply denies the jury's finding of guilt." The district court found that Stanley recruited investors and lenders for CSHC, falsely stated that CSHC owned bond assets and had multiple projects and signed contracts in place, and made false statements to individual investors. Stanley served as CSHC's COO and was named as a contact person on several false press releases. Stanley and Harris jointly provided false financial information to an outside accountant who prepared financial statements for the SEC reflecting misrepresentations. Finally, the court found that Stanley profited significantly from the fraud, drawing more than $300,000 in salary and reaping gains when his ex-wife and daughters sold CSHC's stock at fraudulently inflated prices. The court did not clearly err in finding that Stanley failed to play "a relatively minor role in the conduct" for which he had been convicted. Id.

Stanley's arguments are similarly unavailing at the second step, which provides that courts may compare a defendant's role against other participants. "The fact that a defendant's role may be less than that of other participants engaged in the relevant conduct may not be dispositive of role in the offense, since

it is possible that none are minor or minimal participants." Id.  We quoted in De

Varon the following illustration:

> [I]f three individuals had entered a bank with the intent to commit robbery and one stood guard at the door, another sprayed paint on the camera, and the third gathered the money from a teller's cage, no adjustment for Role in the Offense would be warranted.  Even if one of the participants deserved an aggravating adjustment because of other acts he committed, the other participants would not be entitled to minimal or minor Role in the Offense adjustments.

Id. (quoting United States v. Daughtrey, 874 F.2d 213, 216 (4th Cir. 1989)).  The

Eleventh Circuit has rejected a test that "would require sentencing courts to regard

the least culpable member of any conspiracy as a minor participant, regardless of

the extent of that member's participation."  United States v. Zaccardi, 924 F.2d

201, 203 (11th Cir. 1991) (per curiam).  While the district court concluded that

Stanley's actions were not as egregious as Harris's and sentenced him to a

substantially shorter prison term, it recognized that Stanley played a key part in the

elaborate securities fraud.  The fact that Stanley did less than Harris is not enough

to yield the conclusion that the trial court committed clear error in denying him a

minor role reduction.

## B.

Finally, Stanley argues that his sentence was substantively unreasonable.

We review the substantive reasonableness of a sentence for abuse of discretion.

Gall v. United States, 552 U.S. 38, 51 (2007).  This Court may "set aside a

40

sentence only if we determine, after giving a full measure of deference to the sentencing judge, that the sentence imposed truly is unreasonable." United States v. Irey, 612 F.3d 1160, 1191 (11th Cir. 2010) (en banc).  As a result, we may reverse only if "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." Id. at 1190 (quoting United States v. Pugh, 515 F.3d 1179, 1191 (11th Cir. 2008)).

The district court must impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" listed in § 3553(a)(2), including the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, deter criminal conduct, and protect the public from the defendant's future criminal conduct.  18 U.S.C. § 3553(a).  The court must also consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the applicable Guidelines range, the pertinent policy statements of the Sentencing Commission, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims. Id. § 3553(a)(1), (3)-(7).

In reviewing the reasonableness of a sentence, we first ensure that the sentence was procedurally reasonable: the district court properly calculated the

Guidelines range, treated the Guidelines as advisory and not mandatory, considered the § 3553(a) factors, did not select a sentence based on clearly erroneous facts, and adequately explained the chosen sentence. Gall, 552 U.S. at 51. Then, we examine whether the sentence was reasonable in light of the totality of the circumstances. Id. Stanley argues chiefly that the Sentencing Guidelines themselves fail to take into account critical factors about the offense and the defendant: "the scope and duration of the offense; the motivation for the offense; and the extent to which the offense was exacerbated by factors beyond the defendant's control." Stanley observes that the average sentence length for fraud offenses is 23.2 months, and the average variance is 52.9%. Finally, Stanley identifies cases in which defendants who committed "similar" crimes received much lower sentences. See United States v. Parris, 573 F. Supp. 2d 744 (E.D.N.Y. 2008); United States v. Adelson, 441 F. Supp. 2d 506 (S.D.N.Y. 2006); see also 18 U.S.C. § 3553(a)(6) (listing as a factor to be considered "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

The Government responds that greater deterrence is needed for fraud-based crimes that are "more rational, cool, and calculated than sudden crimes of passion or opportunity" and thus are "prime candidate[s] for general deterrence." United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006). To rebut Stanley's

42

arguments about other sentences around the country, the Government cites United States v. Hill, a case in which this Court rejected a similar claim that a sentence was unreasonable because of disparities in national fraud sentences. 643 F.3d at 885. Hill had been convicted of mortgage fraud that caused a $38 million loss, and was sentenced to 336 months' imprisonment, within his Guidelines range of 324 to 405 months. Id. at 884-85. In finding the sentence reasonable, we stated that comparisons to out-of-jurisdiction cases were "difficult to gauge," and that "we are not convinced that a sentence imposed in this circuit is subject to a national grade curve." Id. at 885. Moreover, the crimes underlying the cases relied upon by Stanley differed substantially from his own conduct. In Adelson, the defendant did not originate the fraud, "only joined the conspiracy toward its end," 441 F. Supp. 2d at 507, had a role like an "accessory after the fact," id. at 513, and had an "exemplary" history, id., unlike Stanley, who played a significant part and had a history of similar activity with the Broadband Wireless scheme. And in Parris, the fraud resulted in only a $5 million loss. 573 F. Supp. 2d at 748.

"Review for reasonableness is deferential. . . . [W]e recognize that there is a range of reasonable sentences from which the district court may choose, and when the district court imposes a sentence within the advisory Guidelines range, we ordinarily will expect that choice to be a reasonable one." United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005) (per curiam). A sentence imposed well below

the statutory maximum penalty is an indicator of a reasonable sentence. United States v. Gonzalez, 550 F.3d 1319, 1324 (11th Cir. 2008) (per curiam). The district court imposed a sentence eighteen months below the bottom of the Guidelines range, forty-eight months below the Government's request, and seventy months below the top of the Guidelines. We have no reason to find, as Stanley suggests, that the Guidelines are substantively unreasonable for all economic fraud crimes involving large losses. See Talley, 431 F.3d at 787 ("[W]e agree that the use of the Guidelines remains central to the sentencing process.").

At the end of the day, we can discern no abuse of discretion: Stanley's below Guidelines sentence was reasonable in light of the statutory purposes recognized in § 3553(a). Again, Stanley's conduct resulted in an estimated 5,894 victim accounts losing many millions of dollars, while Stanley and his family reaped significant financial benefit. The district court reviewed the § 3553(a) factors, and the "biggest" factors in its analysis were the massive losses and the deliberation involved in the offense. Stanley has failed to show that his sentence "is unreasonable in light of the record and the § 3553(a) factors." United States v. Tome, 611 F.3d 1371, 1378 (11th Cir. 2010).

**AFFIRMED.**

44