[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-11194

_____

D.C. Docket No. 1:15-cr-20194-DMM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee

versus

EDMOND DANTES,
a.k.a. Arnold Lewine,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 17, 2018)

Before ROSENBAUM, HULL and JULIE CARNES, Circuit Judges.

PER CURIAM:

After a jury trial, Edmond Dantes appeals his convictions for making false

statements in two applications for a United States passport.  On appeal, Dantes

argues that: (1) the evidence was not sufficient to support his conviction; (2) the district court abused its discretion in admitting into evidence (a) judgments issued by a Colombian family court, (b) handwritten notes of a government witness, and (c) Dantes's prior felony conviction; and (3) the district court erred in concluding that Dantes voluntarily waived his right to counsel and was competent to represent himself at trial and sentencing.  After careful review, we affirm.

## I.    SUMMARY OF PROCEEDINGS

In March 2015, a federal grand jury indicted Edmond Dantes[1] on two counts of making false statements when applying for an American passport, in violation of 18 U.S.C. § 1542.  In particular, the indictment charged that Dantes, who is a native and citizen of the United States but a resident of Colombia, submitted applications in February 2007 (the "2007 Application") and February 2014 (the "2014 Application") for an American passport for a Colombian girl, Katerine.

In those applications, Dantes made the following false statements under penalty of perjury: (1) in the 2007 Application, Dantes stated that a woman named Luz Fanny Munoz ("Fanny") was Katerine's mother (Count 1); and (2) in the 2014 Application, Dantes stated that he, Dantes, was Katerine's father (Count 2).  The indictment alleged that Dantes knew both of these statements were false when he made them.

---

[1]Edmond Dantes was born Arnold Herbert Lewine.  He adopted his current name in 1996.

The district court appointed the Federal Public Defender ("FPD") to represent Dantes. Dantes, however, filed a pro se motion to represent himself, while retaining the FPD as standby counsel. On May 28, 2015, a magistrate judge conducted a Faretta[2] hearing to assess Dantes's waiver of his right to counsel. The next day, the magistrate judge recommended that Dantes's motion to proceed pro se be granted. The district court adopted the magistrate judge's recommendation and allowed Dantes to represent himself at trial.

After a two-day trial, the jury returned guilty verdicts on both counts. The district court sentenced Dantes to 24 months' imprisonment as to Counts 1 and 2, to be served concurrently, followed by 3 years' supervised release as to Counts 1 and 2, to be served concurrently. Dantes has completed his prison term and is now serving his supervised release.

## II.    SUFFICIENCY OF THE EVIDENCE

Dantes's two convictions are for making false statements on applications for an American passport, in violation of 18 U.S.C. § 1542. We start with the sufficiency of the evidence.[3]

---

[2]Faretta v. California, 422 U.S. 806, 95 S. Ct. 2525 (1975).
[3]We review a challenge to the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences and credibility choices in the verdict's favor. United States v. Godwin, 765 F.3d 1306, 1319 (11th Cir. 2014). A guilty verdict cannot be overturned if any reasonable construction of the evidence would allow the jury to find the defendant guilty beyond a reasonable doubt. Id. at 1319-20. In addition, credibility determinations are left to the jury. United States v. Flores, 572 F.3d 1254, 1263 (11th

Section 1542 provides that it is unlawful to "willfully and knowingly make[] any false statement in an application for passport with intent to induce or secure the issuance of a passport under the authority of the United States, either for [one's] own use or the use of another."  18 U.S.C. § 1542 (emphasis added).  The false statement need not be of a material fact.  See United States v. Ramos, 725 F.2d 1322, 1323-24 (11th Cir. 1984).  Rather, "any false statement is sufficient" that is made with the intent to induce or secure a passport.  Id. (quoting 18 U.S.C. § 1542).  "The crime is complete when one makes a statement one knows is untrue to procure a passport."  United States v. O'Bryant, 775 F.2d 1528, 1535 (11th Cir. 1985).  "Good or bad motives are irrelevant."  Id.

As detailed below, the evidence at trial supported a finding that Dantes knowingly made false statements on his passport applications.  We discuss the evidence in the order it was introduced at trial.

## A.    Government Witness Pam Cobb

The government's first witness, Pam Cobb, testified that she began working at the American embassy in Bogota, Colombia in 2013.  Her duties included processing applications for American passports.

Cobb discussed the first passport application that Dantes submitted on Katerine's behalf in February 2007.  Although Cobb did not personally process the

---

Cir. 2009).  This Court will not disturb a jury's credibility determination unless the witness's testimony is "incredible as a matter of law."  Id. (internal quotations omitted).

4

2007 Application, she reviewed the document and was able to glean the following information: Dantes was listed as Katerine's father; Luz Fanny Munoz was named as Katerine's mother; both Dantes and Fanny signed the application under penalty of perjury; and a passport was issued to Katerine as a result of the application. Because Katerine was a minor, that first passport expired after five years.

Cobb testified that in 2014, she personally handled Dantes's second passport application for Katerine. On the 2014 Application, Dantes again identified himself as Katerine's father and identified Fanny as Katerine's mother.[4]

The 2014 Application was missing a required authorization from Katerine's mother. Cobb therefore referred the application for further review. In the subsequent investigation, Cobb asked Dantes about the missing permission from Katerine's mother. At that point, Dantes told Cobb that Fanny was not Katerine's true mother, even though Fanny was listed as the mother on Katerine's birth certificate. Rather, Dantes said, Katerine's mother was "a person named Neraida," who was Fanny's niece.[5] When Cobb investigated further, she discovered that Katerine actually had three birth certificates. Only two of the three birth certificates listed Dantes as Katerine's father.

---

[4]The 2014 Application actually named "Edmond Lewine" as Katerine's father. As noted above, Dantes was born Arnold Herbert Lewine and later changed his name to Edmond Dantes. The alias Edmond Lewine appears to be a mix of his birth and adopted names.

[5]At different points in the proceedings, Fanny was described as Neraida's aunt and as Katerine's aunt.

5

## B.   Government Exhibits

The government then introduced Katerine's three birth certificates, along with two judgments from a family law court in Colombia.[6]  The government called a translator witness, Maria Laura Abal, to verify the English translations of the documents.  The five documents illustrate a sequence of events.

The first birth certificate, dated January 17, 2007, listed Katerine's parents as Dantes and Fanny.

The first family court judgment, dated November 30, 2010, concluded that Neraida and not Fanny was Katerine's mother, stating in translation: "There is no doubt that Ms. Luz Fany Munoz fraudulently claimed her alleged daughter, just as there is no doubt that the biological mother of the minor involved in this case is Ms. Neraida Munoz Acosta."[7]  The 2010 judgment ordered that a corrected birth certificate for Katerine be recorded.

The second birth certificate—the one ordered by the first family court judgment—was dated January 27, 2011, and listed Katerine's parents as Dantes and Neraida.

---

[6]Dantes objected to the admission of the family court judgments both before and during trial.

[7]The family court judgments were heavily redacted so that very little was visible other than the conclusions of the courts.

6

The second family court judgment, dated August 23, 2011, concluded that Katerine was the "biological daughter of Efren Gomez Burbano."  The 2011 judgment ordered that a new corrected birth certificate be recorded for Katerine.

The third birth certificate—the one ordered by the second family court judgment—was dated October 10, 2011, and listed Katerine's parents as Efren Gomez Burbano ("Gomez") and Neraida.

## C.    Government Witness Special Agent Kent Solmonson

The government's next witness was Special Agent Kent Solmonson, from the Miami field office of the Diplomatic Security Service (the "DSS"). Solmonson—together with Antonio Zamudio, another DSS agent and the government's fourth trial witness—helped investigate Dantes's passport applications.  Solmonson testified that in March 2015, he arrested Dantes for passport fraud at Miami International Airport, where, with Zamudio, he interviewed Dantes.

Special Agent Solmonson provided the following testimony about the March 2015 interview.  Dantes initially asked for counsel, but then agreed to speak with the agents immediately without counsel present.  Dantes acknowledged completing and signing the 2007 Application.  He said that he named Fanny as Katerine's mother on the 2007 Application because Fanny was listed as the mother on

7

Katerine's first birth certificate. Dantes admitted that information was not accurate, however, because Katerine's true mother was Neraida and not Fanny.

However, Dantes said he believed "it was possible" that he was Katerine's true father, because he was in a romantic relationship with Neraida. Further, Dantes believed the identity of Katerine's mother was not material to the passport application because Katerine's eligibility for an American passport flowed from him.

Dantes acknowledged that on the 2014 Application, he listed Fanny as Katerine's mother while knowing that was not true, just as he did on the 2007 Application. Dantes also acknowledged listing himself as Katerine's father on the 2014 Application. At that point, Solmonson and Zamudio presented Dantes with the third birth certificate, which said that Katerine's parents were Neraida and Gomez. Dantes responded that he "knew there were other birth certificates out there," but they did not matter because the named father, Gomez, "was a drug dealer, wasn't present, he didn't even know that the child existed." Furthermore, said Dantes, the Colombian court system was corrupt. Dantes said he believed he was Katerine's father, regardless of who the biological father was.

Based on the March 2015 interview, Special Agent Solmonson testified to his belief that Dantes knew when he completed the 2014 Application that he was

8

not Katerine's father and knew when he completed the 2007 application that Fanny was not Katerine's mother.

## D.    Government Witness Agent Antonio Zamudio

The government's last witness was Agent Antonio Zamudio, from the Bogota field office of the DSS. Zamudio testified that he assisted in the investigation of Dantes's passport applications. As part of that investigation, in September 2014, Zamudio visited Dantes at home in Colombia and interviewed Dantes under a tree outside his apartment complex. At that interview, Dantes said that when he completed the 2007 Application, he knew that Fanny was not Katerine's mother, but he did not know that he was not Katerine's father. However, according to Zamudio, Dantes said that he knew both statements about Katerine's parentage were false when he completed the 2014 Application.

Zamudio then testified that in March 2015, a few months after the interview under the tree, he received a phone call from Dantes. Dantes was being held in administrative detention at a Colombian immigration center, because a warrant for his arrest—for passport fraud—had been issued in the United States. Upon receiving this phone call, Zamudio traveled to the immigration center, rendezvoused with Dantes, and accompanied Dantes on a flight to Miami International Airport. When they arrived, Dantes was arrested by Special Agent Solmonson and was interviewed by Solmonson and Zamudio, as described above.

9

Zamudio testified about that March 2015 interview in Miami International Airport. According to Zamudio, Dantes admitted knowing that Fanny was not Katerine's mother when he completed the 2007 Application, and admitted knowing that Fanny was not Katerine's mother and that he was not Katerine's father when he completed the 2014 Application.

Dantes cross-examined Zamudio. Dantes's first question was: "You are a liar; is that correct?" Zamudio said it was not correct. Among other things, Dantes then questioned Zamudio about the fact that Zamudio did not make an audio or video recording of the September 2014 interview under the tree at Dantes's home.

On redirect, the government sought to introduce handwritten notes that Zamudio made during the September 2014 interview. Over Dantes's objection, the district court admitted a redacted version of Zamudio's notes into evidence and allowed Zamudio to read from his notes during testimony. In substance, the notes corroborated Zamudio's testimony about the 2014 interview.

## E.    Dantes's Testimony

After the government rested, Dantes moved for a judgment of acquittal, which the district court denied. The next day, Dantes testified in his own defense in narrative form. In sum, Dantes acknowledged making false statements on the 2007 and 2014 Applications, but argued that the false statements were justifiable or immaterial.

10

Dantes began by acknowledging that he knowingly and falsely listed Fanny as Katerine's mother on the 2007 Application. Dantes stated: "[Y]es, I did put the wrong name on the original passport application when my child was ten weeks old. . . . I put the name of the aunt as the mother." However, Dantes stressed that even if it was a misstatement to list Fanny rather than Neraida as Katerine's mother, the misstatement was not material, because (1) Fanny and Neraida had the same last name, and (2) neither Fanny nor Neraida was a United States citizen, so the misrepresentation had no effect on the government's decision to issue a passport to Katerine.

Separately, Dantes addressed his sworn statements on the passport applications that he was Katerine's father. Dantes discounted the validity of official documents stating that Gomez was Katerine's father. He said that Neraida and Gomez plotted to extort money from him by arranging, through a "corrupt child welfare agency that sells babies," to get a Colombian court to declare that Gomez was Katerine's father. He testified that he never received notice of the family court hearings. He attested that he was not aware of the third birth certificate that listed Gomez as Katerine's father.

As to whether Gomez really was Katerine's father, Dantes testified: "[A]ll I know is who knows if our fathers are really our fathers?" Dantes averred that he believed he was Katerine's father, he did not believe in any Colombian court or

11

agency that said otherwise, and he refused to have a DNA paternity test done. Dantes stated that under Colombian law, a child's "true father is the man who loves and shows affection for the child and supports the child and all the child's material needs."

Dantes concluded his direct testimony by stating: "I spoke the truth, and dear God, I don't lie. . . . I don't know how much longer I have to live, but I'm not going to start a criminal career at 76."

On cross-examination, Dantes acknowledged again that he knew, when he submitted the 2007 Application, that Fanny was not Katerine's mother. Dantes explained: "There was the biological mother and there was the mother who was raising the baby. No, [Fanny] was not the biological mother, she was the child's aunt." However, Dantes denied knowingly making a false statement about Katerine's father. He asserted that "I still believe Katerine is my child." He also denied ever admitting to Agent Zamudio or Special Agent Solmonson that he knew he was not Katerine's biological father.

During its cross-examination, the government sought to impeach Dantes with evidence of a 1991 conviction for child sexual abuse in Florida. The government argued that Dantes had opened the door to this impeachment evidence by asserting that he was "not going to start [his] criminal career at 76." The district court allowed the government to introduce the fact of Dantes's prior conviction

12

over Dantes's objection, but cautioned the government not to discuss the substance of the conviction. The government then asked Dantes if it was true that he had a prior felony conviction, and Dantes admitted it was true.

## F.    Analysis of Evidence

The evidence described above was sufficient for the jury to conclude beyond a reasonable doubt that Dantes knowingly made false statements on his passport applications, as alleged in Counts 1 and 2.

As to Count 1—knowingly and falsely stating that Fanny was Katerine's mother on the 2007 Application—the evidence of Dantes's guilt was virtually uncontested. The government introduced the 2007 Application, in which Dantes attested that Fanny was Katerine's mother. And the government introduced evidence that Dantes knew this statement was false when he made it.

Witnesses Cobb, Special Agent Solmonson, and Agent Zamudio all testified that Dantes told them he knew Fanny was not Katerine's mother when he completed the 2007 Application. Dantes himself testified that he knew Fanny was not Katerine's mother when he completed the 2007 Application. Dantes may not have believed his misstatement was material, but materiality is not an element of the crime. Ramos, 725 F.2d at 1323-24. Rather, the crime was complete when Dantes made a statement he knew was untrue to procure a passport for Katerine.

13

O'Bryant, 775 F.2d at 1535.  As such, the evidence was more than sufficient for the jury to find Dantes guilty beyond a reasonable doubt of Count 1.

As to Count 2—knowingly and falsely stating that Dantes was Katerine's father on the 2014 Application—the government established the fact of the misstatement by introducing Katerine's October 2011 birth certificate, which stated that Gomez was Katerine's father, and the 2014 Application, on which Dantes attested he was Katerine's father.  There were no credible grounds on which Dantes could contest this evidence.  And while the evidence that Dantes knew the misstatement was false when he made it was contested, it required the jury to make credibility determinations.

Special Agent Solmonson testified that when he and Agent Zamudio confronted Dantes with the third birth certificate, Dantes said that he "knew there were other birth certificates out there," but that they did not matter because Gomez "didn't even know that the child existed" and the Colombian court system was corrupt.  Special Agent Solmonson further testified that Dantes said he believed he was Katerine's "true father," regardless of who her biological father was.  Similarly, Agent Zamudio testified that Dantes said more than once—in the September 2014 interview under the tree, and then in the March 2015 interview in Miami International Airport—that Dantes knew when he completed the 2014 Application that he was not Katerine's father.

14

Dantes's own testimony reiterated some of these points. Dantes testified that he did not respect any ruling as to Katerine's paternity by a Colombian court or agency, that he refused to have a DNA paternity test done, and that a child's "true father" is the man who loves, shows affection for, and supports the child. On the other hand, Dantes denied ever admitting to that he knew he was not Katerine's father, and denied knowing about Katerine's October 2011 birth certificate.

Viewing all of this evidence in the light most favorable to the jury's guilty verdict, and drawing all credibility choices in the verdict's favor, we conclude the evidence was sufficient to support Dantes's convictions. See Godwin, 765 F.3d at 1319. In particular, we recognize that the jury credited the government's witnesses rather than Dantes on the question of whether Dantes ever admitted knowing he was not Katerine's father. The jury was entitled to make that credibility determination. Flores, 572 F.3d at 1263. Because the government witnesses' testimony was not "incredible as a matter of law," we do not disturb the jury's verdict. Id.

### III.    EVIDENTIARY RULINGS

Dantes next challenges the district court's decisions to admit three pieces of evidence: (1) the Colombian family court judgments; (2) Agent Zamudio's

15

recorded notes from the 2014 interview; and (3) Dantes's prior felony conviction.[8] We conclude that all of these issues lack merit or, at worst, constitute harmless errors in light of the substantial evidence of Dantes's guilt recounted above. Accordingly, they warrant no further discussion.

Dantes also argues that the district court (1) improperly allowed Agent Zamudio to testify about his opinion as to Dantes's guilt, and (2) improperly allowed Special Agent Solmonson to testify that Dantes initially invoked his right to counsel in the March 2015 interview. Dantes's arguments are without merit. First, Agent Zamudio did not offer his opinion as to Dantes's guilt. Rather, he testified about his personal participation in, and understanding of, the 2014 investigation into Dantes's passport applications. Second, as to the brief right-to-counsel remark, Dantes did not object at trial to this testimony and, in any case, he has not shown the testimony affected his substantial rights.

---

[8]We review a district court's evidentiary rulings for clear abuse of discretion. United States v. Smith, 459 F.3d 1276, 1295 (11th Cir. 2006). An abuse of discretion arises when the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact. Id. If a defendant did not object to evidence at trial, we review its admission only for plain error. United States v. Turner, 474 F.3d 1265, 1275 (11th Cir. 2007). Further, the harmless error standard applies to erroneous evidentiary rulings. United States v. Henderson, 409 F.3d 1293, 1300 (11th Cir. 2005). An evidentiary error is harmless unless it had "a substantial influence on the outcome of the case" or "left grave doubt" as to whether it affected the outcome of the case. Id.

## IV.    WAIVER OF COUNSEL

Dantes's final argument is that the district court did not conduct a sufficient Faretta hearing and that his waiver of his right to counsel was not valid because he was not competent to represent himself.[9]

The issue of Dantes's competency did not arise until the first sentencing hearing on August 18, 2015.  At that hearing, the district court sua sponte became concerned with Dantes's competency at that time and ordered that he undergo psychological examination.  In October 2015 and December 2015, two experts evaluated Dantes and they ultimately prepared reports concluding that Dantes was then suffering from mental disorders that affected his competency as to certain matters.  On February 29, 2016, the district court conducted a competency hearing at which both experts testified.  After hearing their testimony and the arguments of counsel, the district court found that Dantes was competent both at the time of trial and to proceed to sentencing.

### A.    Applicable Law

Encompassed within the Sixth Amendment's guarantee of a right to the assistance of counsel is a criminal defendant's right to represent himself if he so chooses.  U.S. Const. amend. VI; Faretta, 422 U.S. at 818-19, 95 S. Ct. at 2532-33.

---

[9] Whether a defendant validly waived his right to counsel ordinarily is a mixed question of law and fact that we review de novo, with the government bearing the burden of proving that the waiver was valid.  United States v. Garey, 540 F.3d 1253, 1267 (11th Cir. 2008) (en banc).

17

That right, however, is not absolute.  Indiana v. Edwards, 554 U.S 164, 171, 128 S. Ct. 2379, 2384 (2008).  The Supreme Court has held that where a defendant is mentally competent enough to stand trial, but lacks the mental capacity to represent himself, the court may refuse a request by the defendant to proceed pro se at trial. See id. at 167, 177-78, 128 S. Ct. at 2381, 2387-88.

A defendant is competent to stand trial if he: (1) "has a rational as well as factual understanding of the proceedings against him"; and (2) "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding."  Id. at 170, 128 S. Ct. at 2383 (internal quotations and emphasis omitted).  The Edwards Court explained, however, that this baseline level of competency alone may be insufficient to demonstrate a defendant's competence to represent himself, "given the different capacities needed to proceed to trial without counsel" as opposed to merely assisting counsel.  Id. at 177, 128 S. Ct. at 2387. Nevertheless, the Court also emphasized that "the trial judge . . . will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant."  Id.; see also id. at 177-78, 128 S. Ct. at 2387-88 ("[T]he Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so.").

18

A defendant may exercise his right to represent himself by making a "knowing and voluntary" waiver of his right to counsel. United States v. Stanley, 739 F.3d 633, 645 (11th Cir. 2014). The "ideal method" of ensuring a knowing and voluntary waiver is with a pre-trial Faretta hearing, at which the defendant is informed of the charges, basic trial procedures, and the hazards of self-representation. Id. If the record establishes that the defendant "understood the risks of self-representation and freely chose to face them," his waiver may be valid. Id.

This Court has identified eight factors for consideration when determining whether a criminal defendant executed a knowing and voluntary waiver of his right to counsel: (1) the defendant's age, educational background, and physical and mental health; (2) the extent of the defendant's contact with his lawyers prior to trial; (3) the defendant's knowledge of the charges against him, possible defenses, and penalties; (4) the defendant's understanding of rules of procedure, evidence, and courtroom decorum; (5) the defendant's experience in criminal trials; (6) whether standby counsel was appointed, and the extent to which standby counsel aided the defendant; (7) mistreatment or coercion of the defendant; and (8) whether the defendant was trying to manipulate the events of trial. Id. at 645–46 (citing Fitzpatrick v. Wainwright, 800 F.2d 1057, 1065–67 (11th Cir. 1986)).

**B.    Analysis**

Considering the record as a whole, we conclude that the district court conducted an appropriate <u>Faretta</u> hearing under the circumstances.

First, the majority of the <u>Fitzpatrick</u> factors heavily weigh in favor of finding a knowing and voluntary waiver by Dantes. Dantes, who was 75 years old at the time of trial, had attended college and obtained a bachelor's degree. Dantes had significant contact with his appointed AFPD counsel before and during trial, and understood the charges against him. Though Dantes admitted he was unfamiliar with the Rules of Evidence and the Rules of Criminal Procedure, that is also true of most <u>pro se</u> litigants, and Dantes's request to have an AFPD as standby counsel lessens the import of this factor. Furthermore, standby counsel actually assisted Dantes in making evidentiary objections at trial. Dantes also had some prior experience with criminal trials, having represented himself (albeit unsuccessfully) in his 1991 proceeding, and there is no evidence to suggest that he was mistreated or coerced or that he was trying to manipulate the events of the trial.

Thus, the only potential issue with regard to Dantes's waiver of counsel is his appellate counsel's contention on appeal that Dantes was not competent to represent himself and the district court failed to discover that fact at the <u>Faretta</u>

20

hearing.[10]  Importantly, though, at the time of the <u>Faretta</u> hearing, there were no red flags that suggested Dantes was mentally incompetent to represent himself.  <u>Cf.</u> <u>United States v. Cash</u>, 47 F.3d 1083, 1086, 1089-90 (11th Cir. 1995) (finding waiver of counsel invalid where defendant's competency was raised before trial and district court did not conduct a <u>Faretta</u> hearing).  Indeed, Dantes's FPD counsel argued at the <u>Faretta</u> hearing that his motion to proceed <u>pro se</u> should be granted, and later stated at the competency hearing that "had I felt that [Dantes] was incompetent [at the <u>Faretta</u> hearing], it is certainly something that I would have raised."  <u>See</u> <u>United States v. Wingo</u>, 789 F.3d 1226, 1238 (11th Cir. 2015) (noting counsel's failure to raise competency issue can be persuasive evidence that competency is not in doubt).

Nor was any express issue as to Dantes's competency raised during the June 1-2, 2015, trial itself.  Rather, the competency issue arose for the first time at the August 18, 2015, sentencing hearing, where it was raised by the district court <u>sua sponte</u>.  <u>See</u> <u>Stanley</u>, 739 F.3d at 647.  And even then, the district court explained that it was concerned not about Dantes's competence to stand trial back on June 1-2, 2015, but rather his competence to be sentenced.  Moreover, at the competency hearing in February 2016, neither expert expressly opined about Dantes's mental

---

[10]We assume without deciding that <u>de novo</u> review applies to the question of whether the district court correctly applied the law in determining that Dantes was competent to represent himself, and we assume without deciding that we apply the clearly erroneous standard to the district court's factual findings in making that competency determination.

21

state back at the time of trial in June 2015; their opinions were limited to Dantes's

mental state at the time of their evaluations, which took place at least four months

later, first in October 2015 and then in December 2015.

At the February 2016 competency hearing and after hearing the experts'

testimony and argument from both counsel and Dantes himself, the district court

found Dantes was competent to represent himself and to proceed with sentencing.

The district court noted that although Dantes's argument at trial—that the terms

"father" and "mother" have multiple meanings—"didn't carry the day" it was "a

rational argument." The district court explained that Dantes understood the nature

of the charges, the role of the parties, and what was happening during the trial.

Although Dantes exhibited "certain grandiose views and views of persecution,"

those conditions did not "go to the basic facts of his understanding of the legal

process or the issues facing him during the trial." Indeed, the district court

emphasized that Dantes "performed pretty admirably" at trial, noting: "he objected

to the introduction of evidence, he worked with the Standby Counsel to articulate

objections; he did a good job of that." In addition, at the competency hearing,

Dantes himself maintained he was "totally competent."

In sum, the district court concluded:

> Based on my observations of Mr. Dantes during his trial,
> comparing that with my observations of Dantes during
> his first sentencing hearing, and through his many filings
> post trial, I find that he is—he was competent to stand

trial and to go forward to sentencing, although I do think he suffers from delusional thinking and might benefit from treatment with the Department of Corrections.

In other words, after observing Dantes at trial and noting that he presented a rational (if unsuccessful) defense, the district court made a factual finding that he was competent to represent himself as of the time of trial, and we do not find clear error in that ruling on this record.

We likewise find no clear error in the district court's determination that Dantes was competent to proceed with sentencing. Notably, when the district court asked standby counsel, who had assisted Dantes throughout the proceedings, for his thoughts as to Dantes's competency, counsel stated, "I think the Court should find him to be competent and should proceed to sentencing." Counsel reasoned that "throughout the trial, [Dantes] has understood the facts and the allegations" and "has been able to articulate his theory [of defense], [and] advance it forcefully."

Additionally, though both experts stated that Dantes exhibited certain delusional and disordered thinking, they also agreed that Dantes was "bright" and had a factual understanding of the proceedings against him. Their concern regarding Dantes's competency was limited to his ability to rationally appreciate and assist in the proceedings given his delusional thinking.

23

Ultimately, the district court found, based on its observations of Dantes throughout the proceedings, that though Dantes's preoccupation with certain delusions about events in his past distracted him from focusing on relevant issues at sentencing, it did not preclude him from understanding the proceedings or assisting in his defense. The district court, having presided over Dantes's trial and having conducted the competency hearing, was better positioned than we are to assess Dantes's mental capacity to represent himself. See Edwards, 554 U.S. at 177, 128 S. Ct. at 2387. We decline to disturb the district court's findings in that regard on this record.

## VI. CONCLUSION

For the foregoing reasons, we find no reversible error on this record. Accordingly, we affirm Dantes's convictions and sentences.[11]

**AFFIRMED.**

---

[11]The Court denies all pending motions, including counsel's motion to withdraw, as moot. Given this Court's close and thorough review of the record in this case, the Court has decided oral argument is unnecessary.

24