[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 20-13166

————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

DANIEL ERIC COBBLE,

Defendant-Appellant.

————————————

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 5:14-cr-00077-CDL-CHW-1

————————————

Before GRANT, LUCK, and ANDERSON, Circuit Judges.

PER CURIAM:

Daniel Cobble appeals his convictions for three counts of mailing threatening communications, in violation of 18 U.S.C. § 876(c).  He argues that the district court erred when it permitted him to waive his right to counsel and represent himself.

## I.

In a superseding indictment, a grand jury charged Cobble with three counts of mailing threatening communications, in violation of 18 U.S.C. § 876(c).  The indictment stated that he had "knowingly cause[d] to be delivered by the Postal Service" communications threatening to injure and kill two United States District Court Judges.

In January 2016, Cobble's appointed counsel filed an unopposed motion to continue, requesting that the district court direct that a psychiatric and/or psychological evaluation be conducted upon Cobble and to hold a hearing to determine whether he was competent at the time alleged in the indictment and whether he was currently competent to aid counsel in his defense.  Although Cobble had appointed counsel, he submitted numerous *pro se* filings, including a "Declaration of War."  The district court granted Cobble's counsel's motion to continue, finding that it was in the interests of justice to allow the evaluation of Cobble.

In July 2016, the district court received a psychological evaluation of Cobble from Dr. Gregory Prichard. Dr. Pritchard's

diagnostic impressions of Cobble included paranoid personality disorder and delusional disorder, persecutory type. He noted that Cobble appeared to understand what his charges were factually but that his rational appreciation was significantly impaired. He found that Cobble's mental infirmity was "psychotic in nature" and that Cobble was "clearly and grossly" incompetent to proceed. He also found that it would be "difficult to restore" Cobble but that medications could lessen his delusional misperceptions and potentially restore his competency.

The district court held a competency hearing on August 11, 2016. After Cobble interrupted the proceedings and threatened those present, the district court issued a warning that he would be removed if he did so again. Cobble did not comply and so the court had him removed. The district court resumed the hearing.

Government witness Dr. Tennille Warren-Phillips testified Cobble was competent to stand trial. In her interactions with Cobble, he had been more cooperative than he was being in the courtroom, and she never had to end a session with him prematurely because of unruly behavior. During the course of her evaluation, Cobble was required to fill out certain paperwork, and some referred to his pursuit of sovereign citizenship. She had diagnosed Cobble with antisocial personality disorder and a provisional diagnosis of narcissistic personality disorder. In her opinion, Cobble had the ability to assist his counsel in the preparation of his defense if he chose to because he was able to scrutinize the sources of evidence against him, give an opinion on the evidence, and examine

the nature of the charges.  Cobble told her that she could help him by recommending that he be found incompetent because he believed his charges would be dropped if he were found incompetent and not restored to competence.

Dr. Warren-Phillips further testified if Cobble wanted to be more cooperative and compliant, he could.  He had the ability to make a choice in his behavior and actions and control his actions.  He would be able to understand the nature and consequences of the proceedings against him and assist his attorney in his own defense.  Cobble was uncooperative when she asked him questions and refused to take psychological examinations that she offered.

Next, Cobble called Dr. Prichard, who testified he tried to interview Cobble, but Cobble structured and guided the bulk of the evaluation.  He believed that Cobble had a baseline paranoid personality disorder and a mental illness, which was the "delusional disorder persecutory type." A delusional person could not choose to participate in courtroom proceedings because it was not possible to separate the person from the delusion.  A person could be delusional and be able to read and recite a statute, and Cobble was not always delusional in everything he did.  His delusion prevented him from participating because it rendered him unable to participate in a reasonable and rational way.  Dr. Prichard further testified Cobble had factual insight but not rational appreciation.  He believed that Cobble did have some understanding of the nature of the process and the consequences of where that process could lead.

In September 2016, Dr. Richard Adler submitted a forensic psychiatric evaluation of Cobble. explained that he had analyzed psychological reports and interpreted a quantitative electroencephalogram ("QEEG") that was performed on Cobble but he had not personally examined Cobble.  He found that Cobble's QEEG was "clearly abnormal" and that the QEEG results and Cobble's prior medical history contradicted a conclusion that he was of sound mind. He concluded that, should the district court agree that Cobble had a delusional disorder, treatment with antipsychotics could be effective in restoring his competency.

In December 2016, the parties filed a joint motion requesting additional psychiatric and/or psychological evaluation of Cobble and a hearing to determine whether he was competent to aid counsel in his defense.  The government, in particular, requested additional examination based on Dr. Adler's examination.  The district court granted the joint motion.

In February 2017, the parties filed a joint motion submitting that a preponderance of the evidence supported the conclusion that Cobble was suffering from a mental disease or defect that rendered him incompetent to understand the nature and consequences of the proceedings and/or to assist properly in his defense.   The district court granted the parties' joint motion and found Cobble incompetent to proceed.  It ordered that Cobble be hospitalized for no more than four months to determine whether there was a

substantial probability that he would attain the competency required in the foreseeable future.[1]

In February 2018, and after Cobble's extended stay at the Federal Medical Center in Butner, North Carolina, Dr. Tracy Pennuto submitted a forensic evaluation that found Cobble was competent to return to trial if he so chose. She included a certificate of restoration of competency to stand trial certifying that Cobble was able to understand the nature and consequences of the proceedings against him and to assist properly in his own defense. She stated that Cobble had been evaluated through a clinical interview and behavioral observation but had refused a physical examination. She noted that Dr. James Stark and Dr. Prichard had opined that Cobble was not competent but that Dr. Kevin Richards and Dr. Warren-Phillips had opined that he was competent to proceed. She also noted that Dr. Adler had not personally examined Cobble and had relied on a QEEG analysis, which was not widely accepted by the scientific community or in courts. She stated that, based on conversations with Cobble, she thought he demonstrated "an excellent overall knowledge of competency related areas."

---

[1]    Cobble, proceeding *pro se*, appealed the district court's ruling. In February 2018, a panel of this Court affirmed the district court's finding that Cobble was incompetent after reviewing for clear error and finding that the record supported the court's finding that Cobble was mentally incompetent to proceed.

In her evaluation, Dr. Pennuto further stated that Cobble had shown that he could "think critically, problem solve, and strategize when it comes to his defense" and could recite law from memory. She also found that he could understand the pleas he could enter into and what each meant and appeared to understand courtroom vocabulary and vernacular. She found that he had the capacity to disclose pertinent information to counsel and to testify and could work with his attorney if he chose to do so. On the basis of her impressions, she found that his mental health diagnoses were antisocial personality disorder and narcissistic personality disorder traits. She concluded that, based on the available data, Cobble did not appear to have a significant mental disease or defect that would interfere with his competency to proceed.

In July 2018, the district court held another competency hearing for Cobble. The district court noted that it had received Dr. Pennuto's report indicating that Cobble had "recovered his competency" and was sufficiently competent to proceed to trial. The government called Dr. Pennuto, who testified that she agreed with Dr. Warren-Phillips's forensic evaluation of Cobble. She opined that Cobble was competent and did not have a mental disease or defect that rendered him unable to participate in the proceedings. Even though Cobble would not cooperate for formal testing, she was able to assess him through interactions with him and through behavioral observations. In doing so, she assessed that his memory was "quite good," noting that he could cite statutes from memory. She noted that his writing was sometimes difficult

to follow but that, verbally, he could understand questions being asked and respond appropriately when he chose to.  She saw no evidence that he had any receptive or expressive language difficulties.  Through her daily interactions with Cobble over six months, she also assessed aspects of his executive functioning.  She noted that he could "absolutely track information, make connections, show that he could strategize" and read statutes, caselaw, and documents related to his case and come up with strategies for his own defense, even if they were not the best strategies. In Dr. Pennuto's assessment, Cobble was mentally and psychologically the same as he was during the prior report.  She disagreed with the previous legal determination that Cobble was incompetent, based on her review of the previous competency hearing and testimony given at that hearing.

Dr. Pennuto further testified that it was possible that Cobble suffered from "some mild neurocognitive disorder." Even assuming a modest decline in Cobble's cognitive abilities from a prior level, Dr. Pennuto believed that, based on her interactions with him, he was "fully capable" of understanding the nature and consequences of the legal proceedings and could properly assist in his defense at trial.  In her opinion, if the QEEG analysis was the only piece of data used, it would be beyond the professional standard of care in neuropsychology because it had not been widely accepted as a reliable diagnostic tool.

On cross-examination, Dr. Pennuto testified Cobble had an antisocial personality disorder but was not delusional in any way.

She believed Cobble's mental state may have declined from his childhood functioning but not from his previous evaluation. Cobble's antisocial personality disorder did not impact his ability to understand the nature and consequences of the charges against him. It could make him more difficult to interact with, but he could behave and interact appropriately when he chose to do so. She would have expected to discover whether Cobble had a delusional disorder in her interactions with him and did not discover such a disorder. Her interactions with Cobble had been frequent and occurred over a long period of time. She believed he was misguided in the way that he interpreted some legal statutes, caselaw, and other legal matters, and they often discussed what she believed were misinterpretations of the law, although he often disagreed with her. Her inability to conduct diagnostic tests did not impact her assessment of his daily functioning, competency, or whether he had delusional thinking.

Next, Cobble's counsel, over an interjection by Cobble, called Dr. Prichard, who testified he had attempted to evaluate Cobble, who had refused to be evaluated. His primary diagnosis for Cobble was a paranoid personality disorder, which he thought was the baseline. Based on the interactions he had had with Cobble and the documents he reviewed, Cobble demonstrated delusion in the form of a fixed false belief. He explained that Cobble had fixed false beliefs about his prior cases and the court system. Dr. Prichard testified that Cobble had gone over the line of a personality disorder to delusion when it became impossible to get him to view

the case in a rational and reasonable way and understand why he could not pursue it in the manner he was proposing. He described that Cobble's view was "entirely fixed" and "very irrational," such as Cobble's view that he could threaten people, including judges, and that it was a rational solution to his position. That view demonstrated how "out of touch with reality" Cobble was.

Dr. Prichard continued that it would not be possible to change Cobble's mind that he could legally make threats because he was delusional. Based on his experience dealing with individuals with difficult personalities and personality disorders for 22 years, he decided Cobble was delusional and not merely difficult. Dr. Prichard testified that, in his experience, individuals with difficult personality disorders would adjust their thinking to some degree at some point. Most individuals that he dealt with who considered themselves sovereign citizens were not delusional. Sovereign citizenship orientation was an extreme political position and not a fixed false belief. In his opinion, threatening multiple federal judges and family members and threatening to kill individuals in a very graphic way was an irrational way of dealing with his circumstances.

Dr. Prichard further testified his opinion as to Cobble's competence was the same as it was in his previous report, and he did not think that anything had changed. He did not think Cobble was capable of understanding the difference between his representing himself and being represented by an attorney and the advantages and disadvantages. He thought that Cobble could possibly be

restored to competency with medication. Given that Cobble had refused to take medication, his condition was unlikely to change in the foreseeable future unless he was forcefully given those medications.

In response to the district court's questioning, Cobble testified that he believed he was competent to proceed to trial but was not competent at the time of the crime. He told the district judge: "My belief is that I was always competent. My legal argument is that I'm not." He understood that the charges against him were that he caused threatening communications to be made. He understood that the government had to prove he committed that conduct to convict him. He agreed with what the law said but said that "reality" said something different. Contrary to what this Court said, he never appealed his incompetency ruling because his mail was tampered with. He had been through 5 different jury trials and understood that most juries included 12 individuals. He understood that he was in prison serving a state sentence because of two different jury trials. He understood how a jury trial worked, but his attorneys never did what he asked them to do.

When the district court asked whether he understood that he would have the right to call and question witnesses at trial, he answered, "I don't understand that" and said that he "was supposed to have that" right in his last trials, but it did not happen because of his attorney. He understood that "you're supposed to have the right to a fair trial, but there's no such thing."

The district court then asked whether he understood that he had the right to be represented by counsel, but Cobble did not answer directly, despite being asked multiple times. He stated that an attorney told him that he did not have the right to representation and understood that the law said he was "supposed to have a bunch of things" but that "the reality is there's two sets of laws in this country, what you're supposed to do and what you do." When the court asked, "You do understand how it's supposed to work; correct?," Cobble responded, "Yes." Cobble further stated that he always told his attorney what he thought should be done but that they never listened. He said his lawyers were "not trying to do anything realistic."

He further testified that he "knew what [he] was doing" when he was charged with violating a temporary protective order. His defense in this case would be the same as it had been in the past, that he had "the right to resist illegal arrest with all force necessary for that purpose." The district court cautioned that he had the right to remain silent and did not have to say anything about the current charges, which Cobble indicated he understood. He was "not concerned" about anything he said at the hearing being used against him at trial. His defense was that he had "the legal right to write whatever threat I'm accused of writing" but "did not cause it to be sent." He did not write the certified mail form or the return receipt. He said, "My legal argument is that I'm incompetent, but what I want is different."

In explaining his change of opinion as to Cobble's competence to stand trial, the district court noted that it now had the benefit of an additional neuropsychological examination and testimony (i.e., of Dr. Pennuto) that the court found persuasive. The district court found, while Cobble may have an antisocial personality disorder, he appeared sufficiently rational to understand the nature and consequences of the proceedings and could properly assist counsel in his defense. The district court found that Cobble understood legal proceedings "better than most defendants." It continued that, based upon Cobble's responses, it was "clear" that he understood the nature and consequences of the proceedings and "that, while he may be taking certain positions that some may think are disadvantageous to his position, [it did not] think that necessarily mean[t] that he [was] delusional" and did not understand the proceedings. The court further noted that Cobble seemed to have difficulty getting along with his attorneys but that it was convinced that this was his choice and not a result of a mental defect or disorder. It found that Cobble was deciding not to be fully cooperative and deferential and respectful to his counsel and that this behavior did not rise to the level of incompetence. It concluded that, based on the present situation, Cobble was competent to proceed to trial.

In response, Cobble declared that he was firing his attorney and wanted to represent himself. The district court replied that it was required to make certain that Cobble understood the ramifications of his decision. The district court then continued to ask if Cobble understood his rights, to which Cobble gave mostly

indirect answers.  The district court continued to try to explain Cobble's rights that he would be waiving, and Cobble continued not to respond directly to its queries about whether he understood.

At one point, the district court advised, "But you understand that you have these rights and you're giving them up by not going along with a lawyer.  You understand that; correct?"  Cobble responded, "I never had those rights in the first place," and when the court pressed that he did have the rights, Cobble said, "Can't having [sic] something that never existed."  The district court then encouraged him to have counsel but stated it understood that its encouragement would not carry much weight with Cobble.  It gave Cobble the right to represent himself at trial and assigned his current counsel to be standby counsel.  The court asked Cobble if he understood that counsel would be present as standby counsel if Cobble had any questions. Cobble responded, not addressing the statement about standby counsel, that "[t]he only problem I foresee is the way they write the jury when you strike the jury during voir dire." The district court responded by explaining aspects of *voir dire.*

Cobble objected to the government presenting its argument first at trial, and the district court told him he could preserve that objection for later.  The court went on to explain Cobble's rights at trial and the procedures that would be followed.  Cobble responded to the court's monologue with comments about his bad experiences with attorneys.

The district court asked Cobble if he wished to talk to standby counsel after the hearing adjourned, and Cobble stated, "I don't acknowledge his existence." The district court then moved to the topic of witnesses for trial, to which Cobble responded that he had witness subpoenas.

The district court entered an order finding that Cobble was competent to stand trial, based on the evidence presented and the reasons articulated at the conclusion of the hearing. It also found that Cobble was competent to make the decision whether to represent himself and had knowingly, voluntarily, and intelligently chosen to do so. It accordingly accepted Cobble's election to represent himself but ordered that his previous counsel remain as standby counsel during trial and until further order.

Cobble represented himself at trial. At trial, the district court advised the jury that Cobble was competent to stand trial. At the end of the first day of trial, after the jury had been excused, Cobble stated that he intended to kill everyone in the courtroom.

During the second day of trial, the district court advised Cobble that he was not required to testify, the fact that he did not testify could not be used against him, and he had the right to testify if he wished to. Cobble responded that he had been to jury trials before and was familiar with those rights and then asserted that he wished to testify in his own defense. Later that day, Cobble moved for a mistrial so that the matter could be continued and retried with an attorney. The district court denied his motion for a continuance and his alternative motion for a mistrial, finding that it had

provided Cobble with a competent attorney to represent him from the start and that Cobble had chosen to represent himself. Cobble interrupted that he never said he wanted to represent himself but that he wanted to hire an attorney from the start. The district court further noted that, although Cobble had advised that he did not wish for his counsel to represent him, it had still kept the attorney as standby counsel and he had been available for Cobble to consult throughout the trial and at that time. The court concluded that it was inappropriate for Cobble to request to hire counsel at that stage in the proceedings and that Cobble's rights to counsel had not been denied, as he had the full opportunity to have competent counsel and chose not to. During the trial, Cobble gave opening and closing statements, examined witnesses, and made objections.

The jury found Cobble guilty on all counts and the district court sentenced Cobble to 120 months' imprisonment as to Count 1, 120 months as to Count 2 to be served consecutively to Count 1, and 120 months as to Count 3 to be served concurrently with Counts 1 and 2, for a total of 240 months' imprisonment. His standby counsel filed a notice of appeal of the convictions and sentences "based upon Mr. Cobble's expressed desires and intentions to appeal."

## II.

On appeal, Cobble argues that the district court erred when it permitted him to waive his constitutional right to be represented by counsel at trial. Cobble attributes this error to two alleged

deficiencies: (1) he asserts that the district court's *Faretta*[2] colloquy was deficient, and (2) he assets that the *Fitzpatrick*[3] factors weigh in favor of concluding that his waiver of counsel was invalid, focusing primarily on the first such factor and his arguments that his mental problems impaired his ability to waive counsel knowingly. In Part III, we briefly survey the relevant law. In Part IV, we address the sufficiency of the *Faretta* colloquy conducted by the district court and the advice received by Cobble with respect to the risks of self-representation. In Part V, we discuss the *Fitzpatrick* factors, with a focus on Cobble's argument with respect to his mental health.

### III.

Whether a defendant validly waived his right to counsel is a mixed question of law and fact that we review *de novo*. *United States v. Garey*, 540 F.3d 1253, 1268 (11th Cir. 2008) (*en banc*). On direct appeal, the government carries the burden of proving that the waiver was valid. *Id.*

Under the Sixth Amendment, all criminal defendants are entitled to the assistance of counsel. *See* U.S. Const. amend. VI. A criminal defendant may exercise his constitutional right to represent himself by making a "knowing and voluntary" waiver of his Sixth Amendment right to counsel, and clearly and unequivocally

---

[2] *Faretta v. California*, 422 U.S. 806 (1975).

[3] *Fitzpatrick v. Wainwright*, 800 F.2d 1057, 1065–67 (11th Cir. 1986).

asserting his request.  *See United States v. Stanley*, 739 F.3d 633, 645 (11th Cir. 2014).  A defendant makes a clear and unequivocal request for self-representation by either affirmatively invoking his right to self-representation, or by rejecting his only constitutionally entitled counsel with the understanding that his only alternative is self-representation, the dangers of which he is aware. *Garey*, 540 F.3d at 1264–65.

After determining that the defendant clearly and unequivocally invoked his right to self-representation, we determine whether the request was knowing and intelligent by analyzing "the particular facts and circumstances of his case, including his background, experience, and conduct." *United States v. Evans*, 478 F.3d 1332, 1340 (11th Cir. 2007) (quotation marks and brackets omitted). The knowing and voluntary standard considers whether the defendant knows the risks of proceeding without a lawyer and voluntarily makes the decision to proceed without counsel in light of those risks.  *See United States v. Kimball*, 291 F.3d 726, 731 (11th Cir. 2002).  The determination is not concerned with whether the defendant has the necessary legal knowledge to conduct his own defense.  *Id.*  A waiver can be valid when "an uncooperative defendant rejects the only counsel to which he is constitutionally entitled, understanding his only alternative is self-representation with its many attendant dangers." *Garey*, 540 F.3d at 1265.  We may examine the entire record when determining if a defendant's waiver of counsel was knowing and voluntary. *Stanley*, 739 F.3d at 646.

The preferred method of assuring the defendant has made a knowing and intelligent request is to conduct a pretrial *Faretta* hearing, where the defendant can be informed of the charges, basic trial procedures, and the hazards of self-representation. *Id.* at 645. Our case law suggests eight factors (the *Fitzpatrick* factors) for consideration in determining whether a defendant has made a knowing and voluntary waiver:

> (1) the defendant's age, educational background, and physical and mental health; (2) the extent of the defendant's contact with lawyers prior to trial; (3) the defendant's knowledge of the nature of the charges, possible defenses, and penalties; (4) the defendant's understanding of rules of procedure, evidence and courtroom decorum; (5) the defendant's experience in criminal trials; (6) whether standby counsel was appointed, and the extent to which that counsel aided defendant; (7) mistreatment or coercion of the defendant; and (8) whether the defendant was trying to manipulate the events of the trial.

*Id.* at 645–46 (citing *Fitzpatrick v. Wainwright*, 800 F.2d 1057, 1065–67 (11th Cir. 1986)). "The ultimate test is not the trial court's express advice, but rather the defendant's understanding." *Id.* at 645 (quotation marks omitted). We require a more extensive colloquy to waive counsel than to accept a guilty plea. *United States v. Cash*, 47 F.3d 1083, 1088 (11th Cir. 1995)(citing *Stano v. Dugger*, 921 F.2d 1125, 1148 (11th Cir. 1991) (en banc).

We have held that when an unwilling defendant refuses to engage in a dialogue with the district court about the dangers of self-representation, it is sufficient for a district court to unambiguously inform the defendant of the penalties he would face if convicted and provide him with a sense of the challenge he would face as a *pro se* litigant. *Garey,* 540 F.3d at 1267. We held that the court needed to assure that the defendant "(1) understands the choices before him, (2) knows the potential dangers of proceeding *pro se*, and (3) has rejected the lawyer to whom he is constitutionally entitled." *Id.*

When assessing the validity of the waiver, we may consider the district court's dialogue with the defendant in proceedings other than the *Faretta* hearing. In *Stanley*, we held that a district court did not initially conduct an adequate *Faretta* hearing when it failed to inquire into the defendant's health; his understanding of the nature of the charges, defenses, and penalties; his grasp of court rules or procedures; or any mistreatment or coercion motivating the defendant's decision. However, we held that the district court cured its initial error at trial when it inquired further into the defendant's desire to represent himself. *See Stanley*, 739 F.3d at 646. We held that "we can look to the whole record for evidence of whether [the defendant's] waiver was knowing and voluntary and therefore valid." *Id.* In *Stanley*, we held that every *Fitzpatrick* factor except the fifth—that the defendant had no criminal trial experience—"strongly suggest[ed] his waiver was knowing and intelligent." *Id.* at 649. For the other factors, we considered that the

defendant was a 43-year-old high school graduate who had a personality disorder with narcissistic issues but was legally competent and found to be "a very bright man," had a lengthy pretrial relationship with his court-appointed attorney who represented him until the first day of the trial, was aware of the seriousness and complexity of the charges and their penalties, understood that rules existed to govern the procedure of a trial, relied on assistance from standby counsel, did not argue coercion or mistreatment, and attempted to delay and manipulate the proceedings, showing he understood the risks he faced. *Id.* at 646–49 (quotation marks omitted).

We previously have held that the district court erred when it allowed a defendant with a narcissistic personality disorder to represent himself. *Cash*, 47 F.3d at 1089–90. While some of the other *Fitzpatrick* factors had been met, (1) the district court decided on the same day as his trial that the defendant could represent himself; (2) the defendant had limited contact with his appointed lawyer; (3) the defendant had no prior experience in criminal trials and did not consult his standby counsel during trial; and (4) the defendant's personality disorder caused "him to overestimate and overstate his abilities," thus calling into question his claim of legal experience and trial expertise, as well as his understanding of the charges he faced. In *Cash*, we elaborated that—

> Had the district court personally engaged Appellant
> in a discussion as to some of the specific pitfalls he was
> likely to encounter in representing himself and

thereby assured itself that, despite Appellant's ten-
dency to give himself undue credit, Appellant under-
stood the ramifications of his decision, the questiona-
ble nature of Appellant's self-assessments might have
been dispelled. Because no such searching colloquy
occurred, we conclude that the government has failed
to carry its burden of showing that Appellant know-
ingly, voluntarily and intelligently waived his right to
counsel.

*Id.* at 1090. Our explanation indicated that Cash's personality dis-
order was not dispositive. Rather, the deficient *Faretta* colloquy
seems to have driven the decision. *See id.* ("Because no such
searching colloquy occurred, we conclude that the government has
failed to carry its burden of showing that Appellant knowingly, vol-
untarily and intelligently waived his right to counsel.").

## IV.

Having surveyed the relevant law, we turn to Cobble's as-
sertion that the district court's deficient *Faretta* colloquy means
that the district court erred in holding that he had knowingly and
voluntarily waived his right to counsel. Cobble's argument in this
regard is sparse. His only relevant argument boils down to the con-
clusory assertion that the district court failed to warn him of the
pitfalls that "he was likely to encounter in representing himself."
Appellant's brief at 14; *see also id.* at 17 ("In the instant case, there
were no warnings of the pitfalls of self-representation.").

Contrary to Cobble's conclusory assertion, our review of the record reveals that the district court, in its extensive discussions with Cobble, comprehensively advised Cobble of the "dangers and disadvantages of self-representation." *Garey*, 540 F.3d at 1267 (quoting *Faretta*, 422 U.S. at 835). In this case, the district court held two hearings in its effort to determine whether Cobble was competent to stand trial. During the second hearing, in July 2018, the district court conducted this inquiry knowing that Cobble had already told his court-appointed counsel of his intention to terminate counsel. The district court responded that counsel should proceed as his lawyer until the district court determined that Cobble was competent. If and when that happened, the district court indicated it would entertain any request by Cobble to proceed *pro se*. Thus, during the entire July 2018 hearing—both before and after the court found Cobble competent at which time Cobble immediately announced that he was firing his attorney—it is clear that the district court was both eliciting evidence of competence and advising Cobble of his rights.

Although Cobble was uncooperative during the July 2018 hearing, it is nevertheless clear that he did invoke his constitutional right of self-representation, and Cobble does not argue otherwise. We also readily conclude that the district court's *Faretta* colloquy was more than sufficient. The district court comprehensively addressed the dangers and disadvantages of self-representation. The district court repeatedly advised Cobble of the advantages that a trained lawyer would have in protecting his rights. The district

court advised Cobble fully with respect to *voir dire*, opening statements, calling witnesses, cross-examining the government's witnesses, the right not to put up witnesses, the right to testify and the right not to testify pursuant to the Fifth Amendment which cannot be used against him,[4] the closing arguments, the court's instructions to the jury, the fact that the jury would be composed of twelve jurors and that, to convict him, the government would have to convince all twelve jurors beyond a reasonable doubt. The district court also advised Cobble with respect to the nature of the charges and potential penalties. In addition, Dr. Pennuto testified that Cobble understood the nature of the charges and the potential penalties. The district court also discussed with Cobble the insanity defense as well as Cobble's own ideas with respect to his defense. Dr. Pennuto also testified that Cobble was capable of, and did, strategize with respect to his defenses to the charges against him.

In sum, we conclude that Cobble's assertion that the district court's *Faretta* colloquy was insufficient is wholly without merit, both because Cobble's challenge in this regard on appeal is conclusory, and because we conclude that the district court's advice to Cobble and his understanding thereof was more than sufficient.

V.

---

[4] Cobble was also advised about how his Fifth Amendment rights could be waived by testifying or otherwise making statements that might constitute a waiver.

We turn finally to Cobble's argument that the *Fitzpatrick* factors indicate that his waiver of the right to counsel was invalid. We discuss each factor in turn.

A.  The defendant's age, educational background, and physical and mental health

At the time of the pending charges against him, Cobble was in his mid-40s and had a high school diploma/GED. He told the district court that he had taken advanced classes in middle school and was an A student until high school. Nothing in the record suggests that he currently suffers from any physical ailments.

The primary focus of Cobble's appeal is that his "narcissistic personality traits or disorder impaired his ability to waive his right to counsel knowingly." Appellant's brief at 11. We agree with the district court that Cobble's argument is without merit. The district court carefully examined Cobble's mental health history, conducted two hearings to examine Cobble's competency to stand trial, and held a *Faretta* hearing to determine whether Cobble was making a knowing and voluntary waiver of his right to counsel. Like the district court, we have reviewed the extensive evidence of Cobble's mental health history. We agree with the district court that Dr. Pennuto presented the most persuasive evidence. After daily interactions with Cobble over the six-month period that he was at the Butner medical facility, Dr. Pennuto concluded that, although Cobble did have an antisocial personality disorder that may contribute to difficulty interacting with others, he was not delusional and did not have a clinically significant mental disease or

defect that would interfere with his ability to understand the nature and consequences of the proceedings against him. Dr. Pennuto based her conclusions on her daily interactions with Cobble. She described her interactions:

> [t]hrough my interactions . . . with him over the six months that he was there, I was able to assess many aspects of his executive functioning. . . . [H]e was able to absolutely track information, make connections, show that he could strategize, that he could . . . read statutes and case law . . . and come up with strategies, again . . . maybe not the best strategies, but he was able to strategize related to his own defense.

Dr. Pennuto testified that Cobble's antisocial personality disorder

> certainly can make him more difficult to interact with. But, again, that is a choice that he makes. He has demonstrated that he is able to behave appropriately and interact appropriately when he so chooses.

Dr. Pennuto also stated that he could "think critically, problem solve, and strategize when it comes to his defense;" could recite law from memory; could understand the pleas he could enter into and what each meant; and could understand courtroom vocabulary and vernacular.

Cobble's reliance on our decision in *Cash* is misplaced. Unlike *Cash*, the district court's *Faretta* colloquy in this case was comprehensive and dispelled any concern that Cobble failed to

understand the ramifications of his decision.  Moreover, the *Cash* opinion does not reveal anything like the persuasive evidence provided by Dr. Pennuto here, as well as by Cobble's own statements in his extensive colloquy with the district court, that Cobble had a clear understanding of the significance of self-representation and the significance of his decision to proceed *pro se*.

Even if he was competent to stand trial—which he asserts he is not conceding although he does not challenge the district court's finding that he was—Cobble argues that he was not competent to represent himself, thus implicitly arguing that he was not competent to waive his right to assistance of counsel at trial.  It is true that, in *Indiana v. Edwards*, 554 U.S. 164 (2008), the Supreme Court suggested that there may be some daylight between the standard for determining whether a defendant is competent to stand trial and the standard for determining whether a defendant can be permitted to waive the right to counsel and proceed to trial *pro se*.  *See id* at 177–78 ("the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky*[5] but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves"); *see also Holland v. Florida*, 775 F.3d 1294, 1311 (11th Cir. 2014).  We need not in this case decide that issue, or the dimensions of any such daylight.  We agree with the district court that Cobble was not only competent to stand trial,

---

[5] *Dusky v. United States*, 362 U.S. 402 (1960).

but we also agree that the evidence persuasively indicates that Cobble was competent to knowingly and voluntarily waive his right to counsel. Although there was some contrary evidence, the persuasive evidence from the experts—primarily but not solely in the evidence provided in the testimony and report of Dr. Pennuto—together with Cobble's own discussions with the district court convince us that Cobble possessed ample capability to knowingly, intelligently, and voluntarily waive his right to counsel.

Accordingly, the first *Fitzpatrick* factor weights in favor of a waiver.

B. Extent of the defendant's contact with lawyers prior to trial

Cobble was appointed an attorney with the Federal Defenders Office shortly after being indicted in late 2014. That attorney withdrew and the attorney who eventually acted as standby attorney at Cobble's trial took over in early 2017 and represented him at both competency hearings. At the end of the second hearing, when discussing his new role as standby attorney, the district court stated that the attorney and Cobble had "a special relationship," although concededly Cobble refused to acknowledge his standby counsel's presence at that time. Standby counsel did, however, actively represent Cobble with respect to pretrial motions. After the district court granted Cobble's request for self-representation, Cobble forfeited the right to continue representing himself with respect to pretrial matters. Cobble had filed 254 pretrial motions, the vast majority of which were frivolous or immaterial. Accordingly, the

court ordered standby counsel to resume the active representation of Cobble for the remaining pre-trial proceedings, although Cobble would be permitted to represent himself at trial, with counsel reverting to standby counsel.

Cobble had significant experience with lawyers prior to trial, and thus, this factor weights in favor of a waiver.

C.  The defendant's knowledge of the nature of the charges, possible defenses, and penalties

During the second hearing, the district court discussed with Cobble the nature of the charges against him and the penalties as well as his potential defenses. Indeed the court specifically discussed the insanity defense and advised him on what was necessary for claiming it.  Cobble revealed that he had developed a defense: that he was incompetent at the time of the crime but not at the time of the trial.  Based on her lengthy discussions with Cobble about the charges against him, Dr. Pennuto opined that he understands what the charges mean and has a good idea of the potential penalties.  In fact, she testified that he developed strategies for his own defense and that they discussed his interpretations of various statutes.  On the basis of the evidence from Dr. Pennuto, and his own questioning of Cobble, the district court found that "this defendant understands—better than most defendants—legal proceedings . . . [I]t's clear to me that he does have an understanding of the nature of these proceedings and the consequences."

Thus, this factor weighs in favor of waiver.

D. The defendant's understanding of rules of procedure, evidence, and courtroom decorum

During the *Faretta* hearing, the district court went into extensive detail about the benefits of having an attorney. The court's colloquy delved into the ability of trained counsel to question witnesses and protect Cobble's rights. Additionally, the court explained in some detail precisely what would occur at trial, from voir dire to opening statements, cross-examination, Cobble's right not to testify, and jury instructions. Cobble's comments and questions during the *Faretta* hearing displayed extensive knowledge: he asked about possible help with the *voir dire,* commenting on the way in which it was organized and objecting to the government's giving the opening statement. This factor too weighs in favor of waiver.

E. The defendant's experience in criminal trials

At the time of his arrest in this case, Cobble was serving a sentence in state court that was not his first encounter with the criminal justice system. In fact, by his own count, he had been involved in five jury trials before this one. Cobble expressed strong opinions about his experiences with attorneys in these various proceedings that made him want to proceed on his own. Although negative, Cobble's experience weighs strongly in favor of upholding the waiver because it indicates a level of understanding of the procedures.

F.  Whether standby counsel was appointed, and the extent
    to which that counsel aided defendant

Standby counsel was appointed and served as such during
the trial.  However, counsel was ultimately ordered to handle all
pretrial matters because of Cobble's filing of frivolous motions.
Counsel's handling of pretrial matters meant that effectively Cob-
ble was represented when any plea agreement might have been of-
fered.  This factor also weighs in favor of waiver.

G.  Mistreatment or coercion of the defendant

Cobble does not assert that he was mistreated or coerced
nor is there any evidence of either in the record.

H.  Whether the defendant was trying to manipulate the
    events of the trial

There is strong evidence that Cobble was attempting to ma-
nipulate the events at trial.  Cobble actually referred to himself as
a master manipulator.  According to Dr. Warren-Phillips, he asked
her to find him incompetent so he could avoid punishment.  In his
discussions with the district court, Cobble admitted that he used
legal arguments he didn't actually believe in. For example, he told
the court: "I don't believe I'm a sovereign citizen.  I never said that.
It's a legal argument in court."  he told the court: "My belief is that
I was always competent.  My legal argument is that I'm not."  Fi-
nally, he was uncooperative throughout the proceedings in the dis-
trict court, to the point that he had to be removed from the court-
room during one hearing and to the point that he lost his right of

self-representation during pre-trial proceedings for filing so many frivolous pre-trial motions.  But the expert testimony was that his refusal to cooperate was a matter of choice. *See* Doc. 587 at 29 (Dr. Pennuto testified: "But, again, that is a choice that he makes.  He has demonstrated that he is able to behave appropriately and interact appropriately when he so chooses.").

Accordingly, this factor weighs strongly in favor of upholding the waiver.

## VI.

In sum, we reject both of Cobble's arguments on appeal. The *Fitzpatrick* factors weigh strongly in favor of upholding the waiver, and the district court's *Faretta* colloquy was more than sufficient.  Accordingly, we readily agree with the district court that Cobble's waiver of his right to counsel was knowing and voluntary and that the district court did not err in permitting him to represent himself on trial.

The judgment of the district court is

**AFFIRMED.**