[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-14067

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

DEWAYNE DESHUN THORNTON,
a.k.a. Max,
a.k.a. Mad Max,
a.k.a. Max Pain,

Defendant-Appellant.

———————————

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 5:23-cr-00021-TKW-MJF-1

———————————

Before JORDAN, LUCK, and LAGOA, Circuit Judges.

PER CURIAM:

Dewayne Thornton appeals his 216-month sentence imposed after he pled guilty for conspiracy to distribute 50 grams or more of methamphetamine and 500 grams or more of a mixture containing methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vii), & 846. Thornton argues that his sentence was substantively unreasonable because the district court improperly balanced the 18 U.S.C. § 3553(a) factors by inaccurately weighing certain mitigating and aggravating factors. After careful review, we affirm the district court's sentence.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Thornton's Criminal Conduct

Thornton was charged in an indictment with conspiracy to distribute 50 grams or more of methamphetamine and 500 grams or more of a mixture containing methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), and 846 (Count One). Thornton pleaded guilty to that charge pursuant to a written plea agreement.

### B.    Thornton's Sentencing

Prior to sentencing, a probation officer prepared a presentence investigation report ("PSI") that reported the following conduct. As early as 2019, Thornton, Richard Carey Jr., Matthew Aliffi, and several others conspired to purchase and distribute sizeable quantities of methamphetamine throughout the Northern District of Florida. In 2022, federal investigators conducted multiple controlled purchases, aiming to identify a hierarchy among the conspirators and their supply sources. On May 13, 2022, a confidential source arranged for co-conspirator Carey to broker the purchase of 10 ounces of methamphetamine for an undercover agent ("UC") working for the Drug Enforcement Administration ("DEA"). Carey bought a half pound of methamphetamine from Thornton, which he then sold to the UC. Subsequently, on July 14 and November 2, 2022, the UC bought four ounces and ten ounces of methamphetamine, respectively, directly from Thornton. On November 14, 2022, the Dothan, Alabama Police Department executed a search warrant at Thornton's residence, seizing 2.5 pounds of methamphetamine, 15 ounces of synthetic marijuana, and a pistol.

The PSI also provided statements from five cooperating defendants ("CDs") attesting to additional sales of methamphetamine by Thornton. CD1 stated that he purchased about three to four pounds of methamphetamine from Thornton, and that he paid for one purchase by providing Thornton with three firearms. CD2 stated that he twice purchased methamphetamine from Thornton for a total of six ounces. CD3 stated that she made two one-pound

purchases of methamphetamine from Thornton.  CD4 stated that she purchased methamphetamine from Thornton at least three times for a total of seven ounces.  And CD5 stated that she regularly purchased methamphetamine from Thornton during the conspiracy, which the PSI approximated as totaling 31 ounces.  Based on the DEA laboratory's analyses of the methamphetamine purchased and seized by law enforcement, and the statements of the five CDs, the PSI attributed to Thornton 4.86 kilograms of "ice."[1]

The PSI calculated a base offense level of 38, pursuant to U.S.S.G. § 2D1.1(a)(5), based on the 4.86 kilograms of "ice" attributed to Thornton, which exceeded the threshold offense weight category of 4.5 kilograms or more.  The PSI also applied a two-level enhancement for possession of a firearm pursuant to § 2D1.1(b)(1) because Thornton had traded firearms for methamphetamine and possessed a pistol in his home, where he regularly stored and distributed methamphetamine.  Pursuant to § 3E1.1(a)-(b), the PSI applied a 3-level reduction for acceptance of responsibility, resulting in a total offense level of 37.

The PSI then evaluated Thornton's criminal history, placing him in criminal history category II based on three criminal history points.  Thornton received two points for a 2020 conviction for domestic violence, carrying a pistol without a permit, and disorderly conduct, and another point for a 2023 conviction for attempting to elude an officer.  The PSI also detailed a juvenile conviction and a

---

[1] Under U.S.S.G. § 2D1.1, amounts of methamphetamine containing d-methamphetamine hydrochloride of at least 80-percent purity are considered "ice."

host of arrests and pending state charges, a number of which arose from the instant offense conduct.  But these did not affect Thornton's criminal history score.  Based on Thornton's total offense level of 37 and criminal history category of II, the PSI concluded that the guideline imprisonment range was 235–292 months.  The statutory term of imprisonment was 10 years to life.

The PSI also summarized Thornton's personal history and characteristics.  Thornton reported that he had a good childhood and supportive parents, that he maintains close relationships with his extended family, that he earned a high school diploma, that as a 19-year-old he had experienced the death of a friend to gun violence, and that he himself was a victim of gun violence.  Prior to his arrest, Thornton worked on-and-off for Freeman's Tree Service, a family business run by his aunt and uncle.  Thornton has four young children whom he maintains close relationships with and supports financially, despite having no child support obligations.

The PSI did not identify any factors warranting a departure from the prescribed guideline range but suggested—without recommending—several factors that may warrant a variance, including that the offense involved the distribution of large amounts of methamphetamine across a large geographical area, and that Thornton, despite having "minimal" prior convictions, has a "concerning" history of gun possession and has "consistently" been in legal trouble.  Conversely, the PSI noted that Thornton was a

father of four young children, has a supportive family, and had experienced personal trauma relating to gun violence.

Thornton objected to the PSI's drug quantity calculation. Although he accepted attribution for 1,347.3 grams of methamphetamine—the amount recovered via law enforcement's controlled purchases and seizure—he objected to the additional 3,516 grams attributed to him by the CDs' statements. He characterized these as "non-verifiable" estimates and argued that evidence showed that some of these purchases involved mismeasured or diluted amounts and that no lab tests confirmed whether the substances sold to the CDs were "actual methamphetamine versus a mixture." Thornton instead proposed an offense weight between 1.5 and 4.5 kilograms, which would produce a revised total offense level of 35 and a revised guideline imprisonment range of 188–235 months. The government accepted Thornton's proposal, conceding that because the drug weight was "close to the threshold," proving that the estimated quantities were "conservative rather than slightly exaggerate[ed]" would require open court testimony from cooperative defendants whose identities the government preferred to protect. However, the government also stated that it planned to argue at sentencing that criminal history category II "substantially understate[d]" Thornton's criminal history and future dangerousness because of the many charges pending against him. The government argued that, if convicted on the pending charges, those additional points would place Thornton in category V or VI, yielding a hypothetical guideline range of 262–327 months

and potentially justify either an upward departure, upward variance, or a sentence at the high end of the guideline range.

In a sentencing memorandum, Thornton requested a 120-month statutory minimum sentence to run concurrently with any anticipated state term for related conduct. To support this request, Thornton presented several mitigating factors, including that he is 24, has four minor children whom he financially supports, has a "minor" criminal history, has been employed in the family business, and that he recognizes the consequences of his criminal conduct. Thornton also argued that the district court should not give any weight or consideration to "unproven information" from prior arrests and pending charges, as doing so would violate his due process right to be presumed innocent.

At sentencing, the district court adopted the parties' agreed-upon proposed drug weight and offense level adjustments, which yielded a guideline range of 188–235 months' imprisonment. Thornton then requested to have the details about his other arrests and pending charges stricken from the PSI based on the due process concerns outlined in his sentencing memorandum. The district court declined to strike the relevant paragraphs, but assured Thornton that it "assume[d] he did not commit those charges" and that "his sentence is going to be based on his conduct in this particular case [] more so than anything else he may have going on out there." And after hearing additional argument from the government concerning the relevance of Thornton's pending state charges, the district court still concluded that Thornton had the

23-14067              Opinion of the Court                    8

better of the argument, and that it would "be unfair" to reach the conclusion that Thornton's criminal history was underrepresented on the basis of pending charges.

Thornton raised the issue that imposing a sentence within the guideline range created the risk of unwarranted sentencing disparities between himself and his co-conspirators, but the district court interjected with two particular "concern[s] about this case." First, the district court noted that the drug weight now attributable to Thornton was "an extremely conservative estimate" that "likely underrepresents what he was involved with." Second, the district court noted that it was "really, really concern[ed]" that Thornton denied having an addiction problem which, given Thornton's statements about supporting his children, suggested that Thornton distributed methamphetamine for profit. The district court stated that this was a "big problem" which rendered Thornton more culpable than an addict trying to support their own habit.

Thornton responded to the district court's first concern by arguing that the CDs likely exaggerated the estimated drug weights and that the government had chosen to not substantiate the CDs' statements with testimony. The district court acknowledged that "we don't know" the exact amounts, but that "it seems highly, highly unlikely . . . based on what we do know" that the amount calculated in the guideline range was not "fairly conservative" given the duration of the conspiracy and the undisputed amount of methamphetamine distributed.

Thornton also responded to the district court's second concern, arguing that addicts and non-addicts alike are all ultimately in the business of making money through drug sales, and that Thornton was addicted to synthetic marijuana. Thornton also argued that there were multiple mitigating factors in his case, including his age, "minor" criminal history, four children and strong family network, and employment prospects at the family business.

The district court proceeded to sentencing by walking through the § 3553(a) factors. First, the district court addressed the need to craft "a sentence that is sufficient but no greater than necessary." It noted that Thornton's crime was a "fairly run-of-the-mill methamphetamine conspiracy" with "nothing particularly aggravating about this crime[.]" The district court acknowledged that the quantity of drugs implicated, "whether it's more than 4.5 kilograms or between 1.5 and 4.5 . . . is a lot of drugs," but still was still "fairly run-of-the-mill[.]" It also found that Thornton's personal history and characteristics cut both ways. On the one hand, Thornton's strong family network, desire to support his children, and knowledge of right and wrong were "redeemable qualities." But the district court found that these same factors also cut against Thornton because they suggested that he had relative advantages—education, family support, and moral awareness—that the "typical defendant" did not have, yet he nevertheless chose "to go down the wrong path."

The district court next addressed "sentencing disparity" or "the idea that similar defendants should be treated similarly." It

found that the conspiracy involved "a very loose organization," making it "more challenging" to figure out where Thornton "fit within" all the other co-conspirators and what sentence he should receive in comparison to them. But the district court reiterated that a "significant factor in this case" was that Thornton was motivated by profit, not addiction, which suggested that Thornton was "less concerned about what [he's] doing to the community and more concerned about [him]self."

The district court concluded that a balance of the factors supported neither a downward or upward departure and that a "guideline sentence is appropriate in this case." Reasoning that there were not enough mitigating or aggravating factors to justify a sentence at either the bottom or the top of the guidelines, the district court sentenced Thornton to a midrange guideline sentence of 216 months' imprisonment followed by five years of supervised release.

This appeal timely followed.

## II.     STANDARD OF REVIEW

We review the substantive reasonableness of a sentence under an abuse-of-discretion standard, considering the § 3553(a) factors and the totality of the circumstances. *United States v. Boone*, 97 F.4th 1331, 1338 (11th Cir. 2024). We may vacate a sentence only if we are left with the "definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors to arrive at an unreasonable sentence based on the

facts of the case." *Id.* at 1339.  The party challenging the sentence bears the burden of showing that it is unreasonable.  *Id.*

### III.   ANALYSIS

Pursuant to § 3553(a), the district court must impose a sentence "sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public from further crimes of the defendant, and provide the defendant with the necessary training, medical care, and correctional treatment. *See* 18 U.S.C. § 3553(a).  The district court must also consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kind of sentences available and the applicable guideline range, any pertinent policy statement, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims of the offense.  *Id.* § 3553(a)(1), (3)–(7).

The district court imposes a substantively unreasonable sentence when it "(1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (*en banc*) (quotation marks omitted).  We have emphasized that the "decision about how much weight to assign a particular sentencing factor is committed to the sound discretion of the district court" and that we will not "second guess" the weight given to any individual factor so long as the sentence is otherwise reasonable. *United States v. Butler*, 39 F.4th 1349,

1355 (11th Cir. 2022). Indeed, the district court need not give all the factors equal weight and is given discretion to attach great weight to one factor over others. *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015). We have also held that it is within the district court's discretion to find that a purported mitigating factor is aggravating. *Boone*, 97 F.4th at 1343.

We ordinarily expect, though we do not automatically presume, that sentences within the guidelines range are reasonable. *Id.* at 1342; *see Gall v. United States*, 552 U.S. 38, 51 (2007) ("If the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness."). Likewise, a punishment well below the statutory maximum indicates that a sentence is reasonable. *United States v. Stanley*, 739 F.3d 633, 656 (11th Cir. 2014).

Applying our precedent to the facts on the record, we find no basis to conclude that the district court's midrange guideline sentence in a "run-of-the-mill" methamphetamine distribution conspiracy was substantively unreasonable. Thornton's three arguments to the contrary are unavailing.

First, Thornton argues that the district court abused its discretion by failing to properly consider his mitigating factors. But Thornton concedes, and the sentencing record reflects, that the district court "did consider [the relevant mitigating factors] at sentencing." We conclude that the district court did not abuse its discretion by merely disagreeing with Thornton's assessment of the significance of these factors. *See Butler*, 39 F.4th at 1355 ("the weight

given to each factor is committed to the sound discretion of the district court."). The district court also permissibly determined that several mitigating factors—employment prospects, age, education, and strong family support—presented by Thornton were aggravating because they suggested he chose to engage in criminal activity despite these comparative advantages. *See Boone*, 97 F.4th at 1343 (holding that the district court acted within its discretion in finding that defendant's military service was an aggravating factor because it placed him in a position of trust and authority in the community).

Second, Thornton argues that the district court gave undue weight to the seriousness of the offense, and committed a clear error of judgment in finding that the established guideline drug weight was "extremely conservative." But the district court ultimately did not rely on its personal assessment of Thornton's drug quantities in calculating his sentence. In considering the seriousness of Thornton's offense, the district court explained that "the amount of drugs involved . . . *whether it's more than 4.5 kilograms or between 1.5 and 4.5* . . . is a lot of drugs." And we will not "second guess" the district court's weighing of this factor, particularly when the sentence imposed fell well within the guideline range corresponding to the total drug weight stipulated by the parties. *See Butler*, 39 F.4th at 1355.

Third, Thornton argues in passing that the district court placed undue focus on Thornton's profit motive. But we conclude that the district court did not abuse its discretion by "attach[ing]

great weight to [this] factor over others." *Rosales-Bruno*, 789 F.3d at 1254 (quotation marks omitted); *see also* 28 U.S.C. § 994(i)(2); U.S.S.G. 28 §§ 4B1.3, 5H1.9.

The record reflects that the district court properly considered the relevant mitigating and aggravating factors, declined to consider improper factors, and reasonably balanced the applicable factors by imposing a midrange guideline sentence reflecting what it characterized as a "run-of-the-mill" methamphetamine distribution conspiracy. We thus affirm Thornton's sentence.

**AFFIRMED.**